64 A.3d 210

**Gregory HALL, et al.**

v.

**PRINCE GEORGE'S COUNTY DEMOCRATIC CENTRAL COMMITTEE, et al.**

**No. 100, Sept. Term, 2012.**

Court of Appeals of Maryland.

April 8, 2013.

Irwin R. Kramer, (Kramer & Connolly, Reisterstown, MD), on brief; Walter W. Green, (Law Office of Walter W. Green, College Park, MD; Carlton M. Green of Green & Steelman, College Park, MD) on brief for Appellants.

Matthew J. Fader, Asst. Atty. Gen., (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD, and Dan Friedman, Asst. Atty. Gen., Annapolis, MD), on brief; Joseph E. Sandler, (Elizabeth F. Getman of Sandler, Reiff, Young & Lamb, P.C., Washington, D.C.), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

Tiffany Alston, a former member of the Maryland House of Delegates, was removed as a delegate after she had been convicted and sentenced for the common law offense of misconduct in office, contained in an indictment returned in December of 2011. Under the terms of a plea agreement, entered into on October 9, 2012, that resolved the sentence for her misconduct in office conviction,[1] the parties agreed that Ms. Alston would be eligible to have her misconduct in office conviction and sentence modified, at some future time, to probation before judgment, should she complete three hundred hours of community service, make restitution in the amount of eight hundred dollars and pay a fine of five hundred dollars. After sentencing, but before Ms. Alston fulfilled the conditions, the Speaker of the House of Delegates, acting on the advice of Assistant Attorney General Daniel Friedman, declared Ms. Alston removed from her House seat by operation of law and asked the Democratic Central Committee of Prince George's County (Central Committee) to submit to the Governor the name of a replacement.

Gregory Hall was nominated by the Central Committee to fill Ms. Alston's seat on November 7, 2012. Within days, however, while his nomination was before the Governor, aspects of Mr. Hall's past, including his conviction for a misdemeanor handgun charge, which he had not disclosed to the Central Committee, became the fodder of public discourse; on the ninth day after he received the nomination, the Governor requested that the Central Committee withdraw Mr. Hall's

---

1. The plea agreement also resolved other pending charges from an indictment returned in September of 2011, as well as the sentence after a guilty verdict for statutory theft under the indictment issued in December. Because the resolution of the questions in this case hinges on the ramifications of Ms. Alston's sentence for the misconduct in office count, we shall refer to that particular conviction as the "misconduct in office conviction."

nomination. Before the Central Committee acted on the Governor's request, however, and on the thirteenth day after the Governor received the nomination, Mr. Hall filed a complaint in the Circuit Court for Prince George's County against the Central Committee and the Governor, whereby he sought to prevent the withdrawal of his nomination.

Ms. Alston, who by this time had completed the conditions of her plea agreement and had her misconduct in office conviction and sentence modified to probation before judgment, filed, as an intervener and third-party plaintiff in the same case, a separate complaint against the Governor and the Speaker of the House, whereby she sought a declaration that she had been merely suspended from her seat in the House of Delegates by operation of law on the day she was sentenced, rather than removed, because her conviction and sentence had been converted into probation before judgment. Ms. Alston also sought an injunction against the Governor to prevent him from appointing anyone in her stead.

Judge C. Phillips Nichols, Jr. of the Circuit Court for Prince George's County disagreed, however, and ruled, after a hearing, that Ms. Alston had been removed by operation of law on the date she was sentenced for her misconduct in office conviction, pursuant to Section 2 of Article XV of the Maryland Constitution [2] and that the Central Committee had the

---

2. Section 2 of Article XV of the Maryland Constitution, at the time Judge Nichols ruled, stated:

Any elected official of the State, or of a county or of a municipal corporation who during his term of office is convicted of or enters a plea of nolo contendere to any crime which is a felony, or which is a misdemeanor related to his public duties and responsibilities and involves moral turpitude for which the penalty may be incarceration in any penal institution, shall be suspended by operation of law without pay or benefits from the elective office. During and for the period of suspension of the elected official, the appropriate governing body and/or official authorized by law to fill any vacancy in the elective office shall appoint a person to temporarily fill the elective office, provided that if the elective office is one for which automatic succession is provided by law, then in such event the person entitled to succeed to the office shall temporarily fill the elective office. If the conviction becomes final, after judicial review or otherwise, such

power to rescind Mr. Hall's nomination at any time before the Governor made the appointment. Both Mr. Hall and Ms. Alston filed Petitions for Certiorari, which we granted, for consideration together, *sub nom. Hall v. Prince George's County Democratic Central Committee*, 429 Md. 528, 56 A.3d 1241 (2012).

Ms. Alston presents these questions for our review:

I. Does Article XV, § 2 of the Maryland Constitution permit the expulsion of a duly-elected legislator who received a final disposition of probation before judgment?

II. Where charges against an elected official resulted in a final disposition of probation before judgment in another county, did the lower court have the power to revoke this disposition and disqualify that official from completing her term in office? [3]

Mr. Hall presents the following questions: [4]

I. As a matter of first impression, under Art. III, § 13(a)(1) of the Maryland Constitution where a Central Committee submits a name to the Governor within 30 days of a vacancy in the House of Delegates, does the Governor

---

elected official shall be removed from the elective office by operation of Law and the office shall be deemed vacant. If the conviction of the elected official is reversed or overturned, the elected official shall be reinstated by operation of Law to the elective office for the remainder, if any, of the elective term of office during which he was so suspended or removed, and all pay and benefits shall be restored. The language in this Section was modified, subsequent to the events in this case, effective December 6, 2012, to provide for the removal of an elected official who is found guilty of a felony or a misdemeanor related to the elected official's public duties and involving moral turpitude. 2012 Md. Laws, Chap. 147.

3. Because of our holding that Ms. Alston was removed from office by operation of law on the day she was sentenced, we need not address this question. We would note, however, that Judge Nichols did not revoke the disposition of the sentencing judge.

4. Because of our holding that the Central Committee had the authority to rescind Mr. Hall's nomination before the expiration of the fifteen-day window within which the Governor has a duty to appoint the Central Committee's nomination and timely rescinded Mr. Hall's nomination, we shall not address his first question.

have a mandatory duty to appoint the person whose name is submitted to him within fifteen days thereof?

II.   As a matter of first impression, what is the final day for the Governor to appoint under Art. III, § 13(a)(1) of the Maryland Constitution where the fifteenth day following submission of the name falls on a legal holiday?

III.   As a matter of first impression, does the Central Committee have any authority to rescind the name it submitted to the Governor under Maryland Constitution Art. III, § 13(a)(1) more than 30 days after the event that created the vacancy of the office in the House of Delegates?

IV.   Should a writ of mandamus issue to Governor Martin O'Malley to appoint Gregory Hall to the 24th Legislative District seat in the House of Delegates of Maryland?

V.   Did the Circuit Court err in considering on summary judgment an affidavit that was based upon "information or belief"?

After oral argument, this Court entered an Order affirming the judgment of the Circuit Court for Prince George's County. *Hall v. Prince George's County Democratic Central Committee*, 430 Md. 3, 58 A.3d 481 (2013).   We now shall set forth the reasons for that Order.   We shall hold that Ms. Alston was removed from office by operation of law on the day she was sentenced for misconduct in office while in office, notwithstanding the fact that she subsequently was afforded probation before judgment.   We shall further hold, with respect to Mr. Hall's nomination, that the Central Committee acted timely and within its authority when it rescinded his nomination before the Governor acted.

On September 23, 2011, a grand jury in Anne Arundel County returned an indictment (September Indictment) against Tiffany Alston, who was at the time a member of the House of Delegates, charging her with various violations of the Criminal Law and Election Law Articles of the Maryland Code, based on her alleged misappropriation of campaign funds.   Specifically, she was charged with theft offenses under Section 7–104 of the Criminal Law Article of the Maryland Code (2002), fraudulent misappropriation by a fiduciary under

Section 7–113 of the Criminal Law Article,[5] and unlawful and improper disbursements under Section 13–218 of the Election Law Article[6] for acts occurring between April of 2010 and December of 2010, during the time she was campaigning for office.

On December 15, 2011, another grand jury indictment (December Indictment) was returned by an Anne Arundel County

---

**5.** Section 7–113 of the Criminal Law Article, Maryland Code (2002) states:

(a) *Prohibited.*—A fiduciary may not:

(1) fraudulently and willfully appropriate money or a thing of value that the fiduciary holds in a fiduciary capacity contrary to the requirements of the fiduciary's trust responsibility; or

(2) secrete money or a thing of value that the fiduciary holds in a fiduciary capacity with a fraudulent intent to use the money or thing of value contrary to the requirements of the fiduciary's trust responsibility.

(b) *Penalty.*—A person who violates this section is guilty of the misdemeanor of embezzlement and on conviction is subject to imprisonment for not less than 1 year and not exceeding 5 years.

(c) *Statute of limitations and in banc review.*—A person who violates this section is subject to § 5–106(b) of the Courts Article.

**6.** Section 13–218(b) of the Election Law Article, Maryland Code (2002, 2010 Repl.Vol.) states in pertinent part:

(b) *Disbursements—In general.*—(1) Assets of a campaign finance entity may be disbursed only:

(i) if they have passed through the hands of the treasurer; and

(ii) in accordance with the purposes of the entity.

\* \* \*

(d) *Disbursements.—Chairman of campaign finance entity.—*

(1) If the treasurer of a campaign finance entity is temporarily unable to perform the duties of the office, the chairman of the campaign finance entity may make a disbursement on behalf of the campaign finance entity in the same manner as the treasurer.

(2) If the chairman makes a disbursement under this subsection, within 7 days after making the disbursement, the chairman shall submit a report to the treasurer for the account book of the campaign finance entity, including:

(i) a statement of the expenditure made under the authority of the chairman;

(ii) the name and address of the person to whom the expenditure was made;

(iii) the purpose for which the expenditure was made; and

(iv) a copy of the receipt for the expenditure that was made.

(3) A chairman who is a candidate may not make a disbursement for a campaign finance entity.

grand jury against Ms. Alston, this time for conduct that occurred between January 7, 2011 and January 26, 2011, during which period of time she was a member of the House of Delegates. The December Indictment alleged that she directed her legislative clerk, who was being paid by the State as an employee, to perform work for Ms. Alston's law firm. Ms. Alston was charged with violating Section 7–104 of the Criminal Law Article for theft under one thousand dollars and misconduct in office.

Separate trials were scheduled in Anne Arundel County, but Ms. Alston was tried on the December Indictment first. In June of 2012, a jury returned a verdict of guilty as to both counts, which embodied offenses that qualified her for removal under Section 2 of Article XV of the Maryland Constitution; the trial judge, Judge Paul F. Harris, Jr., however, deferred sentencing until resolution of the charges in the September Indictment.

In October of 2012, however, Ms. Alston negotiated a plea agreement, which purported to resolve not only the outstanding charges in the September Indictment but also the sentence from her convictions of the charges in the December Indictment. Under the terms of the plea agreement,[7] Ms.

---

7.  The terms of the plea agreement included:
    1.  Tiffany Alston agrees to immediately withdraw with prejudice her Motion For Appropriate Relief, Including Motion to Dismiss Indictment, In The Alternative, Motion to Set Aside Jury Verdict, In The Alternative, Motion For New Trial Defendant Requests A Hearing filed on June 22, 2012. Ms. Alston further agrees to waive her rights to any and all further post-conviction proceedings in Case # K–11–2626 and Case # K–11–2040.
    2.  The State will recommend, and Ms. Alston will not contest, that Ms. Alston be sentenced on Count 2, Misconduct in Office, in Case # K–11–2626 to one year incarceration with the entire term suspended, followed by three years of probation. As conditions of that probation, the State will recommend, and Ms. Alston will not contest, that the Court order that Ms. Alston (1) pay restitution of $800.00 to the Maryland General Assembly and (2) perform 300 hours of community service at a mutually agreed upon, legitimate non-profit or governmental agency. The location where Ms. Alston performs her community service may be subject to change upon approval of the State, which shall not be unreasonably withheld

Alston specifically agreed to waive her appellate and post-conviction rights in both cases, agreed to a sentence of "one year incarceration with the entire term suspended, followed by three years of probation," with the additional conditions that she pay restitution in the amount of eight hundred dollars to the Maryland General Assembly and perform three hundred hours of community service. Furthermore, Ms. Alston would be permitted to seek, and the State would not oppose, a modification of sentence for her misconduct in office conviction, if she completed her community service, paid the ordered restitution, and paid the civil fine.

At the sentencing hearing, Judge Harris accepted the plea agreement and agreed that he would be bound to grant the probation before judgment,[8] stating "I don't want to stand in

---

nor delayed. The State will recommend that the Defendant receive probation before judgment on Count 1, misdemeanor theft. The Defendant may seek a Modification of Sentence requesting probation before judgment on the misconduct in office conviction. The State shall remain silent and the Court agrees to bind itself to striking the guilty conviction and granting Ms. Alston probation before judgment on Count 2 in the case # K–11–2626 immediately upon (i) completion of three hundred hours of community service, (ii) payment of $800.00 in restitution, and (iii) payment of a civil citation fine in the amount of $500.00.

3.  **Furthermore,** with respect to Case # K–11–2040, Ms. Alston will tender an Alford Plea to Count 4 of the indictment, Fraudulent Misappropriation by a Fiduciary. The State will recommend that the Defendant be sentenced to probation before judgment. In addition, the State will issue and Ms. Alston agrees to pay a non-criminal civil citation in the amount of $500.00 for a violation of Section 13–218(d)(3) of the Election Law Article. The State agrees to enter a nol pros to counts 1, 2, 3, and 5 of the indictment upon the court's acceptance of the guilty plea to Count 4.

4.  Finally, the parties agree that the court be notified immediately that a resolution in these cases has been reached and request that this matter be set in so that she may tender her Alford Plea at the Court's and parties' earliest convenience.

As was noted by Judge Nichols, the use of the term "Alford Plea" with respect to Count 4 of the September indictment was incorrect; Ms. Alston actually entered a plea of *nolo contendere*.

8.  The Governor and Speaker question whether the plea was binding, noting that Judge Harris informed Ms. Alston that it was "not an ABA binding plea deal." We have assumed, for the purposes of our discussion, that Judge Harris was, in fact, bound by the terms of the plea agreement.

the way of whatever plea you all have worked out." There was no mention of staying the misconduct in office conviction in the plea agreement, and Judge Harris specifically noted, when he accepted the guilty plea and again on the verdict sheet, that he was staying the conviction for Count 1 of the December Indictment, which was a statutory theft violation, but not Count 2, the misconduct in office Count about which the issue is joined. Moreover, Judge Harris stated, in the course of accepting Ms. Alston's plea agreement, that, "[s]o, I just want to make sure that's clear; however, a [probation before judgment] is not something that would be happening right away, on count—the misconduct count under [the December Indictment]. . . . That's the one that the guilty finding will stand until conditions of probation are met."

Ms. Alston filed a motion for modification of her sentence for the misconduct in office conviction immediately, which was held *sub curia* until she completed her financial and community service obligations. In early November, Ms. Alston requested a hearing to secure probation before judgment on the misconduct in office count. The hearing was held on November 5, 2012, at which time Judge Harris and the parties agreed that Ms. Alston needed to perform an additional eighty hours of community service in order to discharge her obligations. On November 13, 2012, Judge Harris held another hearing to address the request for modification.

Prior to the hearing, Ms. Alston submitted various proposed orders. Her primary request was that the order resolving her request for modification should declare her original conviction "reversed and overturned as a matter of law," but Judge Harris refused, stating, "[a] probation before judgment is not a reversal of a conviction nor is a conviction overturned by operation of law. That's not what a [probation before judgment] is." Ms. Alston then requested that the judge declare that the probation before judgment be entered *nunc pro tunc* as of the date of her original conviction, but the judge again refused. She then requested a third iteration, which would have declared the entry of probation before judgment to be entered *nunc pro tunc* as of the day of the earlier hearing on

modification, November 5, 2012; the judge again disagreed, stating that "[Ms. Alston] didn't comply with the conditions as of that date."

While all of the judicial machinations were transpiring, Daniel Friedman, an Assistant Attorney General who operated as Counsel to the General Assembly, issued an advice letter dated October 10, 2012 to the Speaker of the House of Delegates, Michael Busch, in which Mr. Friedman opined that Ms. Alston had been suspended by operation of law on October 9, 2012, the day she was originally sentenced by Judge Harris.[9]  Thereafter, on November 1, 2012, Mr. Friedman issued yet another advice letter to the Speaker that addressed the ramifications of Ms. Alston's misconduct in office conviction beyond her suspension.  In the latter letter, Mr. Friedman opined that Ms. Alston was permanently removed from office by operation of law on the day of her sentencing as a result of her sentence to a term of imprisonment, and that a subsequent modification of her sentence, even if done in accordance with her plea agreement, was not sufficient to prevent her removal:

> Ms. Alston appears to argue that, if Judge Harris grants Ms. Alston's motion to modify, her conviction will never "become[ ] final, after judicial review or otherwise" and, implicitly, will have been "reversed or overturned," thus allowing her to resume her office. I disagree. It is my view that Ms. Alston's conviction became final by virtue of her receiving a conviction and, simultaneously, forfeiting her appellate rights. At that time, Ms. Alston's conviction was final and could not longer be "reversed or overturned" by an appellate court so as to allow her to be reinstated. Rather,

---

9.  The advice letter confined itself only to the question of whether Ms. Alston had been suspended: "Because it is important to provide immediate clarity on the issue of whether Delegate Alston has been suspended, I have provided this advice on an expedited basis and without addressing other potential ramifications of Delegate Alston's criminal case."

her conviction became final, not by "judicial review," but "otherwise," by her waiver of her appeal rights.

(modification in original).

The next day, the Prince George's County Democratic Central Committee met to nominate a replacement for Ms. Alston to the Governor, pursuant to Section 13(a)(1) of Article III of the Maryland Constitution.[10]  The Central Committee interviewed various candidates, including Gregory Hall, who was asked whether there were any problematic events in his past that would bear on his fitness to serve as a Delegate, to which he answered that he had had some problems in his past, but he did not offer any specifics.  The Central Committee voted to nominate Mr. Hall to Ms. Alston's seat, but thereafter learned that Mr. Hall had been convicted in state court in 1992 of a misdemeanor handgun violation.

After public discourse occurred about Mr. Hall's conviction and before taking any action on the nomination, the Governor, on November 16, 2012, sent a letter to the Central Committee asking that it withdraw Mr. Hall's name and take no further action until he had an opportunity to secure a formal opinion, requested by Ms. Alston, from the Attorney General confirming the advice contained in the earlier advice letter that Ms. Alston was removed and not merely suspended.  The Central

---

**10.** Section 13(a)(1) of Article III of the Maryland Constitution states:

In case of death, disqualification, resignation, refusal to act, expulsion, or removal from the county or city for which he shall have been elected, of any person who shall have been chosen as a Delegate or Senator, or in case of a tie between two or more such qualified persons, the Governor shall appoint a person to fill such vacancy from a person whose name shall be submitted to him in writing, within thirty days after the occurrence of the vacancy, by the Central Committee of the political party, if any, with which the Delegate or Senator, so vacating, had been affiliated, at the time of the last election or appointment of the vacating Senator or Delegate, in the County or District from which he or she was appointed or elected, provided that the appointee shall be of the same political party, if any, as was that of the Delegate or Senator, whose office is to be filled, at the time of the last election or appointment of the vacating Delegate or Senator, and it shall be the duty of the Governor to make said appointment within fifteen days after the submission thereof to him.

Committee agreed, adding "Withdrawal of District 24 nomination to Governor" to the agenda for its November 20, 2012, meeting. The Attorney General, within days, issued a formal opinion to the Governor, affirming the advice given by Mr. Friedman that Ms. Alston's seat was vacated by operation of law when she was sentenced on October 9, 2012. 97 Op. Atty. Gen. 58 (2012).

Before the Central Committee met to consider the withdrawal of his nomination, on the thirteenth day after his name had been submitted, Mr. Hall filed a Complaint in the Circuit Court for Prince George's County seeking a temporary restraining order, as well as a preliminary and a permanent injunction against the Central Committee and the Governor to prevent the withdrawal of his nomination.[11] The temporary restraining order did not issue, but Judge C. Phillip Nichols, Jr. issued a show cause order to entertain arguments regarding other injunctive relief. In light of the judge's decision, the Central Committee voted to hold in abeyance any action to withdraw Mr. Hall's nomination until after the show cause hearing.

Within days, however, the Chair of the Central Committee called an emergency meeting for November 26, 2012, the fifteenth day after Mr. Hall's nomination was submitted.[12] Mr. Hall then filed an amended complaint requesting injunctive relief to prevent the Central Committee from taking any action related to the withdrawal of his name. Ms. Alston intervened as a third-party plaintiff in the matter, asserting her claim against both the Governor and the Speaker of the House of Delegates that she had not been removed from office

11. Mr. Hall's original complaint named only the Central Committee as a defendant. He amended his complaint to include the Governor as a defendant.

12. As will be more fully explained *infra,* the fifteenth day after the Governor received Mr. Hall's nomination was actually Friday, November 23, 2012. November 23, however, was a State holiday, so the expiration of the fifteen-day period occurred on the next business day, which was Monday, November 26, 2012.

by operation of law, because her conviction had been modified to probation before judgment.

Judge Nichols held a hearing on the afternoon of November 26, 2012, during which the parties all agreed and the Judge ordered that "the Central Committee shall not take any binding action concerning a withdrawal of Mr. Hall's name to represent the 24th Legislative District of the Maryland House of Delegates unless, following a hearing on the merits, the Court rules that the Central Committee was entitled, on November 26, 2012, to withdraw Mr. Hall's name." At the meeting on the 26th, the Central Committee adopted a non-binding resolution, by a vote of 20–1, that "it was the 'sense of the Committee' that the Committee 'withdraws its recommendation of Mr. Hall per request from Governor Martin O'Malley and pending the results of legal proceedings before the Prince George's County Circuit Court." [13]

Judge Nichols held a hearing, within a week, to consider motions for summary judgment filed by all of the parties. Judge Nichols filed an opinion the next day, in which he ruled that Ms. Alston's seat in the House of Delegates was vacated by operation of law on the day she was originally sentenced, October 9, 2012, that the Central Committee had the right to withdraw a name submitted to the Governor at any time before the Governor made the appointment, and that the

---

13. This language is taken from the affidavit of Terry Speigner, the Chair of the Central Committee. Mr. Hall argues that this affidavit was improperly admitted into evidence at the hearing before Judge Nichols because, he asserts, it was "not made on 'personal knowledge' and is not 'true.'" This argument is disposed of by the language of the affidavit. In the first paragraph, Mr. Speigner states "I, Terry Speigner, certify that I am over the age of eighteen (18) years, competent to testify to the matters set forth herein and *have personal knowledge of the following matters....*" (emphasis added). Moreover, in the concluding affirmation, Mr. Speigner affirms that "the foregoing matters and facts are true and correct to the best of my knowledge, information and belief." While Mr. Hall is correct that we have held that the language "best of my knowledge, information, and belief" is not sufficient to meet the requirement of personal knowledge, *e.g. County Commissioners v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 102–04, 747 A.2d 600, 611 (2000), Mr. Speigner satisfied the requirement in the affidavit.

Governor's duty to appoint the name sent by the Central Committee was merely directory, not mandatory. Both Ms. Alston and Mr. Hall appealed to the Court of Special Appeals, while also petitioning for certiorari, and we granted the petitions before any proceedings in the Court of Special Appeals.

Central to our discussion of whether Ms. Alston was removed from her seat by operation of law because of her misconduct in office conviction is the relationship between Section 2 of Article XV of the Maryland Constitution, the constitutional provision governing the removal of elected officials who have been convicted of a crime, and a disposition of probation before judgment, under Section 6–220 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl.Vol.).[14] Section 2 of Article XV of the Maryland Constitution in effect at the time of the hearing stated:

Any elected official of the State, or of a county or of a municipal corporation who during his term of office convicted of or enters a plea of nolo contendere to any crime which is a felony, or which is a misdemeanor related to his public duties and responsibilities and involves moral turpitude for which the penalty may be incarceration in any penal institution, shall be suspended by operation of law without pay or benefits from the elective office. During and for the period of suspension of the elected official, the appropriate governing body and/or official authorized by law to fill any vacancy in the elective office shall appoint a person to temporarily fill the elective office, provided that if the elective office is one for which automatic succession is provided by law, then in such event the person entitled to succeed to the office shall temporarily fill the elective office. If the conviction becomes final, after judicial review or otherwise, such elected official shall be removed from the elective office by operation of Law and the office shall be deemed vacant. If the conviction of the elected official is reversed or over-

---

14. Unless otherwise noted, all references to Section 6–220 are to Section 6–220 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl.Vol.).

turned, the elected official shall be reinstated by operation of Law to the elective office for the remainder, if any, of the elective term of office during which he was so suspended or removed, and all pay and benefits shall be restored.

Section 2 of Article XV, Maryland Constitution (2003 Repl. Vol.).

Section 6–220, in pertinent part, provides:

(b) *In general.*—(1) When a defendant pleads guilty or nolo contendere or is found guilty of a crime, a court may stay the entering of judgment, defer further proceedings, and place the defendant on probation subject to reasonable conditions if:

(i) the court finds that the best interests of the defendant and the public welfare would be served; and

(ii) the defendant gives written consent after determination of guilt or acceptance of a nolo contendere plea.

(2) Subject to paragraphs (3) and (4) of this subsection, the conditions may include an order that the defendant:

(i) pay a fine or monetary penalty to the State or make restitution; or

(ii) participate in a rehabilitation program, the parks program, or a voluntary hospital program.

\*   \*   \*

(g) *Effect of fulfillment of conditions of probation.*—(1) On fulfillment of the conditions of probation, the court shall discharge the defendant from probation.

(2) The discharge is a final disposition of the matter.

(3) Discharge of a defendant under this section shall be without judgment of conviction and is not a conviction for the purpose of any disqualification or disability imposed by law because of conviction of a crime.

■ The gravamen of our inquiry is whether a probation before judgment, entered after conditions are fulfilled, harkens back to the date of the original conviction and sentencing for purposes of collateral consequences. Section 6–220(g)(3) ("Discharge of a defendant under this section shall be without

judgment of conviction and is not a conviction for the purpose of any disqualification or disability imposed by law because of conviction of a crime.") provides that if the conviction and sentence are stayed, pursuant to Section 6–220(b)(1) ("When a defendant pleads guilty or nolo contendere or is found guilty of a crime, a court may stay the entering of judgment, defer further proceedings, and place the defendant on probation subject to reasonable conditions ....."), a probation before judgment entered subsequently acts to strike the conviction from the defendant's record. Obviously, a probation before judgment entered on the day of sentencing is effective at that time.[15]

Ms. Alston argues that she cannot be removed because, at the time of sentencing, the Circuit Court bound itself to convert her sentence for misconduct in office into probation before judgment, which should have had the effect of removing the misconduct in office conviction from her record and permitting her to assume her legislative duties. Essentially, she is arguing that the probation before judgment she received approximately a month after her original sentencing should relate back to the sentencing date.

The Governor and Speaker Busch respond by arguing that Ms. Alston's misconduct in office conviction exposed her to the collateral consequence of being removed from office when Judge Harris entered judgment on her misconduct in office conviction at the time of sentencing, rather than staying the conviction. They further assert that the later conversion of her sentence into probation before judgment was not sufficient to prevent her removal, as it was a collateral event that had no bearing on whether the initial misconduct in office conviction was final. Whether the Circuit Court Judge bound himself to modify the sentence to probation before judgment was irrelevant, according to them, because any modification would be

---

**15.** Ms. Alston's second proposed order, discussed *supra,* embodied this state of affairs, as it was an attempt to have the probation before judgment be effective as of the date of her original sentencing (October 9, 2012).

subsequent to the finality of the misconduct in office conviction.

■ We agree with the analysis offered by the Governor and the Speaker. The basis of our decision rests on the fact that the conviction for misconduct in office was *not stayed*, but rather, *clearly entered* as a judgment by Judge Harris on the day of the original sentencing, even if he had bound himself to the probation before judgment once the conditions were fulfilled. A conviction and sentence in and of themselves, not stayed, carry legal disabilities and collateral consequences, if any are appropriate. *See, e.g., Myers v. State,* 303 Md. 639, 647–48, 496 A.2d 312, 316 (1985) (holding that a woman who had been found guilty of perjury but was afforded probation before judgment was not disqualified from testifying in a later trial); *Jones v. Baltimore City Police Department,* 326 Md. 480, 489–90, 606 A.2d 214, 218 (1992) (holding that a police officer who had been found guilty of possession with the intent to distribute child pornography but was afforded probation before judgment was entitled to a full administrative hearing to determine if he should have been removed from the police force because a "judgment of conviction" had not been entered). Here, Judge Harris clearly and unequivocally convicted Ms. Alston on the misconduct in office count as a result of her guilty plea and did not enter the stay required by Section 6–220(b)(1) in order for a probation before judgment to harken back to the date of original sentencing.

At the sentencing hearing, when Judge Harris was advising Ms. Alston of the ramifications of her plea agreement, the following colloquy regarding the disposition of her misconduct in office conviction occurred at various times during the proceedings:

Judge Harris: So, I just want to make sure that that's clear; however, a [probation before judgment] is not something that would be happening right away, on count—the misconduct count under Case 2626,—

Mr. Davitt [the State prosecutor]: Correct.

Judge Harris: That's the one that the guilty finding will stand until conditions of probation are met.

\*  \*  \*

Judge Harris: The plea also states that the State will remain silent and that the Court agrees to bind itself to striking that conviction and granting a probation, on this case, *upon completion of those conditions.*

\*  \*  \*

Judge Harris: But because you've demonstrated such irresponsibility in this case, I think three years of probation, on this case, is certainly appropriate. As soon as you finish your three hundred hours, and as soon as you pay the eight hundred dollars, it will transition into a probation before judgment. But I'm not going to assume you're going to do that without something hanging over your head. It's that simple. You've just demonstrated that irresponsibility throughout this case.

\*  \*  \*

Judge Harris: Now, I think I've stated the terms consistent with the plea. Counsel, with regard to the probation before judgment, you can advise your client about her waiver of appeal rights, there, but you can also advise her of her rights as a result of the conviction, *which does stand on count two,* at this moment.

(emphasis added).

Judge Harris clearly knew the distinction between entry of judgment on a conviction and staying such entry of judgment because, on the verdict sheet, he entered the probation before judgment on the statutory theft offense by noting that it was effective only as to the statutory theft count in the December Indictment.

It is clear, thus, that Judge Harris knew that what he was doing was not in concert with the strictures of the probation before judgment statute when he did not stay the conviction and sentence. No objection was made by Ms. Alston, and no motion to withdraw her guilty plea was ever offered by her.

To hold that collateral consequences, such as that which inured to Ms. Alston as a result of the entry of judgment and conviction, would not be a consequence, *in the absence of a stay,* would be to eviscerate the probation before judgment statute and violate its plain meaning. The consequence of saying that staying the judgment is not important would be to negate the necessity of fulfilling conditions. In the arena of collateral consequences, this would have implications. For instance, where an individual is required to register as a sexual offender under Section 11–704 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl.Vol.),[16] were he or she to enter a plea of guilty and seek a probation before judgment, in the absence of a stay, his or her sex offender status would not be in effect, under Ms. Alston's theory, and he or she would have no incentive to fulfill the conditions because there would be no spectre of consequences in the absence of a stay. Similarly, if an individual were prohibited from owning a regulated firearm under Section 5–133(c)(1) of the Public Safety Article of the Maryland Code (2003, 2011 Repl.Vol.), because of a conviction for a crime of violence, and sought a probation before judgment without staying of the conviction, that individual would be prohibited from possessing the regulated firearm during the time the conviction stood. Under Ms. Alston's view, the hypothetical defendant would be able to continue to possess a regulated weapon while having conviction for a violent crime entered against him or her.

Specifically, because no stay of Ms. Alston's conviction and sentence for misconduct in office was entered on October 9, 2012, the collateral consequence of removal was triggered, as

---

**16.** Section 11–704 provides, in pertinent part:
(a) *In general.*—A person shall register with the person's supervising authority if the person is:
(1) a tier I sex offender;
(2) a tier II sex offender;
(3) a tier III sex offender[.]
Section 11–704(a) of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl.Vol.).

long as the constitutional provision was satisfied. Section 2 of Article XV of the Constitution states, in pertinent part, that, "[i]f the conviction becomes final, after judicial review or otherwise, such elected official shall be removed from the elective office by operation of Law and the office shall be deemed vacant." In terms of finality, Ms. Alston argues that her conviction never became final, because the plea agreement contemplated that her misconduct in office conviction and sentence would be modified to probation before judgment and that the "final" disposition was probation before judgment, not a conviction. The Governor and Speaker respond by arguing that the fact that Ms. Alston's misconduct in office conviction and sentence were subject to modification has no bearing on whether that conviction was final because she was sentenced and waived her appeal rights.

Regarding finality by judicial review, in *Terry v. Warden of Maryland Penitentiary*, 243 Md. 610, 611–12, 221 A.2d 691, 692 (1966), we adopted the standard set forth by the Supreme Court of the United States regarding finality of a conviction and stated it as: "denoting the point of time when the courts are powerless to provide a remedy for the defendant on direct review. . . ." *Id.* at 612, 221 A.2d at 692. Clearly, finality "by judicial review" refers to the end of direct appellate jurisdiction. Finality under the "or otherwise" provision has never been explored by this Court, although finality in a case, other than by the end of appellate rights, can only occur when a convicted person waives his or her right to appeal or allows the appeal period to lapse. Ms. Alston lost her ability to seek direct review because she waived her appeal rights on the record. (After being informed by her Counsel during the advisement of her rights that "under the terms of our agreement, you will not be filing for an appeal . . . ," Ms. Alston responded "Yes" and confirmed her understanding with another "Yes" when her counsel asked if she was sure.) The result is not altered in any way by Judge Harris's agreement to grant a probation before judgment upon a modification motion, if Ms. Alston fulfilled the conditions. Our brethren on

the Court of Special Appeals have succinctly stated the obvious, stating:

> a conviction was finally adjudicated when the judgment of conviction had been rendered, the availability of direct appeal had been exhausted and the time for petitioning for certiorari to the Court of Appeals of Maryland and to the Supreme Court of the United States had elapsed.... Subsequent actions do not alter the finality of the original conviction, even though, as we have said, many state and federal remedies remain to correct injustice.

*Avery v. State,* 17 Md.App. 686, 692–93, 304 A.2d 856, 859 (1973). The fact that a probation before judgment could have been entered, if conditions were met by Ms. Alston, does not change the fact that finality attached to the judgment of conviction as to the misconduct in office count on October 9, 2012, *without* a stay, and, as of that moment, Ms. Alston was removed as a Delegate by operation of law from her seat.

■ With respect to Mr. Hall's claims, under Section 13(a)(1) of Article III of the Maryland Constitution,

> [i]n case of death, disqualification, resignation, refusal to act, expulsion, or removal from the county or city for which he shall have been elected, of any person who shall have been chosen as a Delegate or Senator, or in case of a tie between two or more such qualified persons, the Governor shall appoint a person to fill such vacancy from a person whose name shall be submitted to him in writing, within thirty days after the occurrence of the vacancy, by the Central Committee of the political party, if any, with which the Delegate or Senator, so vacating, had been affiliated, at the time of the last election or appointment of the vacating Senator or Delegate, in the County or District from which he or she was appointed or elected, provided that the appointee shall be of the same political party, if any, as was that of the Delegate or Senator, whose office is to be filled, at the time of the last election or appointment of the vacating Delegate or Senator, and it shall be the duty of the

Governor to make said appointment within fifteen days after the submission thereof to him.

Our resolution of Mr. Hall's claims rests on whether the Central Committee had the power to rescind its nomination once given to the Governor, and, if it did, whether it acted to rescind the nomination on a timely basis. While we have never considered the issue heretofore, the California Supreme Court, in *In re Petition of the Commission on the Governorship of California,* 26 Cal.3d 110, 160 Cal.Rptr. 760, 603 P.2d 1357 (1979) (en banc), directly did so, albeit in a different context. In the case, the California court considered whether an appointment made by the Lieutenant Governor, while the Governor was absent, was properly withdrawn by the Governor upon his return. *Id.* at 1365. In holding that the Governor had the power to rescind the appointment, the court made clear that "uncompleted appointments are subject to withdrawal." *Id.* The court based its holding, in part, on the principle that, "[t]he withdrawal power prolongs gubernatorial scrutiny of the appointment, furthering the confirmation's ultimate purpose of assuring thorough consideration of the candidate's qualifications." *Id.*

While the instant case deals with the allocation of power between the Central Committee and the Governor, as opposed to the Governor and the California Commission on Judicial Appointments, the principle remains the same: the ability to rescind a nomination that has not been acted upon furthers the goal of ensuring that the process is a deliberative one. *See also Cook v. Botelho,* 921 P.2d 1126, 1129 (Alaska 1996) (holding that the Governor of Alaska no longer had the power to rescind his nomination because, "[c]ourts have uniformly held that an executive's power to reconsider an appointment ends when the executive takes the last act required to complete the appointment process").

The situation also is analogous to that of basic contract law with respect to offer and acceptance; an offer that has been extended, but not yet accepted, generally can be withdrawn by the offeror. *E.g., Coleman v. Applegarth,* 68 Md.

21, 29, 11 A. 284, 286 (1887) ("[T]he verbal agreement of Applegarth operated simply as a mere continuing offer at the price previously fixed, and which offer only continued until it should be withdrawn or otherwise ended by some act of his; *but he was entirely at liberty at any time, before acceptance, to withdraw the offer....*" (Emphasis added)); *see also Pavel Enterprises, Inc. v. A.S. Johnson Company*, 342 Md. 143, 152–54, 674 A.2d 521, 526 (1996) (acknowledging the general rule that an offer may be rescinded until it is accepted).

Obviously, the facts of this case do not involve an offer and acceptance from a first year Contracts course in law school, but they are similar in that the Governor and the Central Committee must both have timely acted for the appointment to be completed, just as there would have to be action on the part of both an offeror and an offeree to form a contract. While our case concerns an uncompleted nomination, rather than an uncompleted appointment as was in *In re Petition of the Commission on the Governorship of California* or a contract, the principle holds true: one who has the power to nominate or offer has the inherent power to rescind that nomination or offer until it has been accepted.

■ The only remaining matter is to address whether the Central Committee withdrew its nomination before the expiration of the fifteen-day window provided by the Constitution. It is uncontested that the fifteenth day after the Governor received Mr. Hall's nomination was Thursday, November 22, 2012, but this was Thanksgiving. The next day, Friday, November 23, 2012 was a State holiday: Native American Heritage Day. The next day on which State government was operating was Monday, November 26, 2012. As was made clear at the hearing before Judge Harris, the parties stipulated that if the Central Committee had the authority to rescind its nomination on November 26, then it did not lose that right by virtue of the court proceedings. Thus, the only question we must decide is whether Saturday, November 24, 2012, should mark the end of the fifteen-day window, or whether it should be Monday, November 26, 2012.

Mr. Hall argues that the constitutional provision uses the language of "within fifteen days" and that the only reasonable interpretation of this would mean that there can be no extension of the time because the ending date is a holiday or a Saturday, stating "assuming that the Governor would not perform his ministerial duty on a holiday, the Governor had until the last day preceding the holiday to perform his ministerial duty. . . ." Alternatively, he argues that the Court should adopt the computation of time in Section 36 of Article I of the Maryland Annotated Code (1957, 2011 Repl.Vol.) that, if the last day of a time period is a Sunday or a holiday, "the period runs until the end of the next day, which is neither a Sunday or a holiday."

The Central Committee responds by noting that Section 36 of Article I of the Maryland Annotated Code "does *not*, by its terms, apply to the computation of time under the Maryland Constitution," because it only applies to statutes. The Central Committee notes that all parties agree that there is no defined manner by which to calculate this time period in the Constitution itself, and argues that the only reasonable manner by which to calculate the ending date is to exclude days the State government is not open, including Saturdays.

We agree with the Central Committee's analysis. The notion that the Governor must have acted before Thanksgiving is without basis in the law. As was noted by Mr. Hall, our statutes provide mechanisms for calculating the ending points for various time frames under our statutes and Rules. These statutes provide for taking action beyond what would have been the last day upon which action was allowed because it would not be possible to act on that day. For example, were the filing of an answer to a complaint to be required by a Saturday, Maryland Rule 1–203(a) would permit the party to file on the following Monday.[17] There is simply no merit in

---

17. Rule 1–203(a) states, in pertinent part that: "the last day of the period so computed is included unless: (1) it is a Saturday, Sunday, or holiday, in which event the period runs until the end of the next day that is not a Saturday, Sunday, or holiday[.]"

the argument that the time period cannot be extended; the principle was announced over a century ago in *Monroe Cattle Company v. Becker*, 147 U.S. 47, 56, 13 S.Ct. 217, 220, 37 L.Ed. 72, 76 (1893): "when an act is to be performed within a certain number of days, and the last day falls on Sunday, the person charged with the performance of the act has the following day to comply with his obligation."

In this case, the act that must be completed before the expiration of the fifteen-day window was an exercise of governmental power by the Governor. To exercise this power, it is axiomatic that the government must be operating. Thus, the only reasonable interpretation is that, if the final day of the fifteen-day window falls on a holiday, a Saturday, or a Sunday, the Governor has until the next day the government is operating to make his appointment, which, in this case, was Monday, November 26, 2012. Given the parties stipulation before Judge Harris and our determination that the Central Committee had until November 26, 2012 to withdraw Mr. Hall's nomination, we conclude that the Central Committee timely withdrew the nomination and the Governor was free to appoint another individual to the seat.

For all of the foregoing reasons, we have affirmed the judgment of the Circuit Court for Prince George's County in an Order dated January 4, 2013.

BELL, C.J., HARRELL and GREENE, JJ., dissent.

Dissenting Opinion by BELL, C. J., which HARRELL and GREENE, JJ., join.

The Maryland Constitution, *see* Article XV, Section 2,[1] permits the removal from office of a delegate only where there

---

1. Article XV, Section 2 provides:

   Any elected official of the State, or of a county or of a municipal corporation who during the elected official's term of office is found guilty of any crime which is a felony, or which is a misdemeanor related to the elected official's public duties and responsibilities and involves moral turpitude for which the penalty may be incarceration in any penal institution, shall be suspended by operation of law

is a qualifying conviction, which has become "final, after judicial review or otherwise." The majority concludes that, because Delegate Alston waived her rights to appeal[2] the

without pay or benefits from the elective office. During and for the period of suspension of the elected official, the appropriate governing body and/or official authorized by law to fill any vacancy in the elective office shall appoint a person to temporarily fill the elective office, provided that if the elective office is one for which automatic succession is provided by law, then in such event the person entitled to succeed to the office shall temporarily fill the elective office. If the finding of guilt becomes a final conviction, after judicial review or otherwise, such elected official shall be removed from the elective office by operation of Law and the office shall be deemed vacant. If the finding of guilt of the elected official is reversed or overturned, the elected official shall be reinstated by operation of Law to the elective office for the remainder, if any, of the elective term of office during which the elected official was so suspended or removed, and all pay and benefits shall be restored. Any elected official of the State, or of a county or of a municipal corporation who during the elected official's term of office enters a guilty plea or a plea of nolo contendere to any crime which is a felony, or which is a misdemeanor related to the elected official's public duties and responsibilities and involves moral turpitude for which the penalty may be incarceration in any penal institution, shall be removed from the elective office by operation of Law and the office shall be deemed vacant.

When Delegate Alston was tried, Article XV, Section 2 provided no authority for her removal as a delegate. It did not, at that time, include, as qualifying events, a finding of guilt by a jury, a plea of no contest, or the entry of probation before judgment. To be sure, in the 2012 election, the voters approved an amendment to that constitutional provision, which expanded the grounds for removing public officials; however, even though the newly inserted qualifying events were applicable in the future, they applied only prospectively.

That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal are oppressive, unjust and incompatible with liberty; wherefore, no ex post facto Law ought to be made; nor any retrospective oath or restriction be imposed, or required.

Md. Const. Decl. of Rts. art. 17. Therefore, Delegate Alston could only have been removed if the finding of guilt, entered on her guilty plea, was, or became, a final conviction upon appellate review or otherwise.

2.  It is interesting and quite significant that the reason for the waiver of appeal, on which the majority so heavily relies, is the fact that Delegate Alston entered into the plea agreement that is at issue here. She pled guilty to three charges in return for the dismissal of the remainder of the charges and a specific disposition, probation before judgment ("PBJ"), as to the charge, misconduct in office, about which she was most concerned. When a defendant pleads guilty, he or she waives the

qualifying conviction, misconduct in office, 431 Md. at 129–30, 64 A.3d at 223–34, and because the trial judge did not stay that conviction,[3] *Id.* at 125–26, 64 A.3d at 221, the entry by the trial judge of a guilty finding as to the misconduct in office charge, followed by the imposition of sentence resulted in Delegate Alston's conviction of that offense and that, at that moment, the conviction was final within the contemplation, and in satisfaction, of Article XV, Section 2 of the Maryland Constitution. It is my view, however, that, because the trial court agreed to strike their guilty finding it entered against Delegate Alston, vacate her conviction and enter PBJ, if she completed three hundred hours of community service, paid

---

right to appeal, except as to a few narrow grounds, none of which are at issue or applicable here. *See* Md.Code Ann., Cts. & Jud. Proc. § 12–302(e)(2); *Ward v. State,* 83 Md.App. 474, 480, 575 A.2d 771, 774 (1990) (internal citations omitted) (stating, "The standard in determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.") That is especially the case when the plea is for a specific disposition. Indeed, as a prerequisite to obtaining a PBJ, a defendant must expressly state on the record that he or she gives up the right to appeal.

(e)(1) By consenting to and receiving a stay of entering of the judgment as provided by subsections (b) and (c) of this section, the defendant waives the right to appeal at any time from the judgment of guilt.
(2) Before granting a stay, the court shall notify the defendant of the consequences of consenting to and receiving a stay of entry of judgment under paragraph (1) of this subsection.

MD Code, Crim. Proc. Art. § 6–220(e).

3. I agree with the majority that, had the trial judge stayed entry of judgment and only entered PBJ when the conditions attached to the plea had been fulfilled, we would not be here on this issue, although, as we shall see, we might have been on an issue raised by the State. A stay of disposition would have, to be sure, given Delegate Alston the benefit of her bargain, but not strictly as the plea agreement contemplated, from which the State could argue that it did not get the benefit of its bargain. *See Chertkov v. State,* 335 Md. 161, 174, 642 A.2d 232, 238–39 (1994). As I see it, the stay issue is a red herring. Whether Delegate Alston was entitled to a stay or should have sought one is simply not the issue. It is, as we shall see, whether she was entitled to enforcement of the plea agreement. As she argues, and I shall demonstrate, she was. That fact also puts the lie to the notion that the misconduct in office conviction was a final conviction.

$800.00 in restitution, and paid $500.00 in civil fines, Delegate Alston's conviction was not, and could not have been, final within the contemplation, and in satisfaction of Article XV, Section 2. Consequently, I do not believe that the Legislature had the power, or the authority, to remove Delegate Alston from its body. For this reason, I dissent.

When Delegate Alston appeared at the sentencing hearing, she had been convicted of theft under one thousand dollars and misconduct in office, and she faced three future charges: theft, fraudulent misappropriation by a fiduciary, and improper disbursements in violation of the Election law. Rather than go to trial, she entered into an agreement with the State, under the terms of which the State agreed to drop most of its charges against her and, with regard to the misconduct in office charge, upon her completion of certain enumerated conditions, to permit, indeed, to join with Delegate Alston in her effort to get the trial court to bind itself to, the entry of probation before judgment. In reference to Delegate Alston's plea to misconduct in office, the second provision of the plea agreement provides (citations omitted):

"The State shall remain silent and the *Court agrees to bind itself to striking the guilty conviction* and granting Ms. Alston probation before judgment on Count 2 in the case # K–11–2626 immediately upon (i) completion of three hundred hours of community service, (ii) payment of $800.00 in restitution, and (iii) payment of a civil citation fine in the amount of $500.00."

The trial judge accepted the plea agreement, thereby binding himself to the specific disposition, with regard to the misconduct in office charge, of PBJ. To be sure, the plea agreement envisioned the imposition of a guilty finding as to misconduct in office and the imposition of sentence, hence a conviction; nevertheless, the ultimate disposition for that offense, thus the final sentence was, it was agreed, PBJ, assuming the specified conditions were met. The trial court understood this to be the case: he repeated this understanding of the agreement to Delegate Alston on the record, stating, "As soon as you finish your three hundred hours, and as soon as

you pay the eight hundred dollars [the convictions] will transition into probation before judgment." The trial court therefore bound itself to modify Delegate Alston's conviction for misconduct in office upon her completion of the plea agreement's requirements.

The reason for entering the plea was obvious: Delegate Alston wanted to avoid removal from office. As the applicable constitutional removal provision then stood, only a final judgment of conviction would serve as a predicate for removal. It is well settled that PBJ is not a conviction for disqualification purposes.[4] It was consistent with her purpose for entering the plea agreement, though by no means necessary,[5] for Delegate Alston to file at sentencing a motion to discharge her convictions. The judge agreed to hold the motion *sub curia* pending Delegate Alston's performance of the conditions set forth in the plea arrangement.

Delegate Alston also indicated that she accepted this agreement in order to expedite her return to the House of Delegates. She said as much at the sentencing hearing, at which the trial court accepted the plea bargain arrangement, explaining that she had already begun the process of completing her community service hours prior to that hearing. Delegate Alston also indicated that she would be "diligently completing the community service hours" in order to return to work "full time as a delegate." Delegate Alston, in addition, expressed on the record that she sought to complete her community service hours before the ratification of the constitutional amendment that would expand the basis for removing elected

----

4. It is generally held that a probation before judgment is not a conviction. *Jones v. Baltimore City Police*, 326 Md. 480, 488, 606 A.2d 214, 218 (1992) ("[T]he legislature intended that a grant of probation before judgment, unless subsequently altered by a violation of that probation, should have the effect of wiping the criminal slate clean.")

5. Filing such a motion was not necessary because the court was required, committed, by the plea agreement, to strike the misconduct in office conviction, but it was presumably considered to be wise given the State's position with regard to the meaning of finality and the effect of the plea agreement.

officials from office. Neither the Court nor the State challenged her purpose and neither, but especially the State, suggested that there were other purposes or that those she expressed were not viable under the plea agreement.

When the trial judge accepted the plea agreement and promised, when appropriate, to strike her conviction for misconduct in office, the plea agreement became an inviolate part of the trial court's disposition. *See Dotson v. State*, 321 Md. 515, 523, 583 A.2d 710, 714 (1991).

A plea agreement is a contract between the defendant and the State.[6] Md. Rule 4–243(a)(6). Principles of fair play and

---

**6.** Maryland Rule 4–243 governs plea agreements and prescribes the authority to enter plea agreements, as well as the kinds of agreements permitted and the procedures applicable to such agreements. As pertinent to the agreement in this case, it provides:

"(a) Conditions for Agreement.

"(1) *Terms.* The defendant may enter into an agreement with the State's Attorney for a plea of guilty or nolo contendere on any proper condition, including one or more of the following:

"(A) That the State's Attorney will amend the charging document to charge a specified offense or add a specified offense, or will file a new charging document;

"(B) That the State's Attorney will enter a nolle prosequi pursuant to Rule 4–247(a) or move to mark certain charges against the defendant stet on the docket pursuant to Rule 4–248(a);

✻     ✻     ✻

"(F) That the parties will submit a plea agreement proposing a particular sentence, disposition, or other judicial action to a judge for consideration pursuant to section (c) of this Rule."

Rule 4–243(c) addresses the procedure and potential dispositions applicable to such plea agreements. It provides:

"(c) Agreements of Sentence, Disposition, or Other Judicial Action.

"(1) *Presentation to the Court.* If a plea agreement has been reached pursuant to subsection (a)(1)(F) of this Rule for a plea of guilty or nolo contendere which contemplates a particular sentence, disposition, or other judicial action, the defense counsel and the State's Attorney shall advise the judge of the terms of the agreement when the defendant pleads. The judge may then accept or reject the plea and, if accepted, may approve the agreement or defer decision as to its approval or rejection until after such presentence proceedings and investigation as the judge directs.

"(2) *Not Binding on the Court.* The agreement of the State's Attorney relating to a particular sentence, disposition, or other judicial action is not binding on the court unless the judge to whom the agreement is presented approves it.

equity, moreover, underlie every plea agreement. *See State v. Brockman*, 277 Md. 687, 697, 357 A.2d 376, 383 (1976). Contract principles alone, however, are inadequate to resolve disputes over the enforcement of a court-approved plea bargain. *See Cuffley v. State*, 416 Md. 568, 580, 7 A.3d 557, 569 (2010). Once a plea agreement is entered by the court, constitutional due process demands that the plea bargain be honored.[7] *Solorzano v. State*, 397 Md. 661, 673, 919 A.2d 652, 659 (2007) (citing *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427, 433 (1971)). Thus, due process concerns for fairness and the adequacy of procedural safeguards guide the interpretation and enforcement of any court approved plea agreement. *See Cuffley v. State*, 416 Md. 568, 581, 7 A.3d 557, 564 (2010).

When the defendant and the State reach a plea agreement, their expectations, as represented and reflected in the agreement, are not binding on the court. *See Solorzano v. State*, 397 Md. 661, 670, 919 A.2d 652, 658 (2007). When, however, the judge accepts a plea agreement, it becomes an "inviolate part" of his disposition and carries the "force of law." *Dotson v. State*, 321 Md. 515, 523, 583 A.2d 710, 714 (1991). *See*

---

"(3) *Approval of Plea Agreement.* If the plea agreement is approved, the judge shall embody in the judgment the agreed sentence, disposition, or other judicial action encompassed in the agreement or, with the consent of the parties, a disposition more favorable to the defendant than that provided for in the agreement. "(d) Record of Proceedings. All proceedings pursuant to this Rule, including the defendant's pleading, advice by the court, and inquiry into the voluntariness of the plea or a plea agreement shall be on the record. If the parties stipulate to the court that disclosure of the plea agreement or any of its terms would cause a substantial risk to any person of physical harm, intimidation, bribery, economic reprisal, or unnecessary annoyance or embarrassment, the court may order that the record be sealed subject to terms it deems appropriate."

7. It is well-settled, as both this Court and the United States Supreme Court have held, that where "a plea rest[s] in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Tweedy v. State*, 380 Md. 475, 484, 845 A.2d 1215, 1220 (2004) (quoting *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971)).

Maryland Rule 4–243(c)(3) ("the judge shall embody in the judgment the agreed ... disposition, or other judicial action encompassed in the agreement"). If a plea agreement is breached by either the prosecutor or the court, the defendant is entitled to the benefit of the bargain, which, at the defendant's option, is either specific enforcement of the agreement or withdrawal of the plea. *Baines v. State*, 416 Md. 604, 7 A.3d 578 (2010). "[A]llowing the plea agreement to be violated, even if not by the trial judge, would be inconsistent with the standard of fair play and equity." *Chertkov*, 335 Md. at 174, 642 A.2d at 238 (quoting *Dotson v. State of Maryland*, 321 Md. 515, 523, 583 A.2d 710, 713–714 (1991) (internal quotations omitted)).

In *Dotson v. State*, 321 Md. 515, 583 A.2d 710 (1991), this Court considered the propriety and effect of a reviewing court's change of a sentence imposed by a trial court pursuant to a binding plea agreement. In *Dotson*, the trial judge approved, and bound himself to follow a plea agreement that limited the defendant's sentence to 15 years imprisonment. The trial court, following the terms of the plea agreement, sentenced the defendant to a prison term of 15 years. *Id.*, 583 A.2d at 712. On subsequent review, a three judge sentencing panel increased the defendant's sentence to 30 years. *Id.* at 521, 583 A.2d at 713. This Court reversed that panel's decision, holding that the review panel's sentence was illegal. The Court explained:

"The convictions here ... were obtained by guilty pleas tendered under a plea agreement. The aspect of the agreement which motivated the pleas was that if they met the required criteria for acceptance, the judge would impose a sentence not to exceed a total of 15 years. The agreement did not preclude Dotson from seeking a lesser sentence but bound the judge firmly into the imposition of a sentence of not more than a total of 15 years. As we have indicated, the judge found the pleas to be acceptable, convicted Dotson thereunder and honored the agreement as to the punishment. When the judge accepted the pleas, the agreement as to punishment came into full bloom; it stood approved by

the judge. Thereafter, the agreement was inviolate, and the judge was required under the dictate of Rule 4–243(c)(3) to embody in the judgment the agreed sentence. Our rules have the force of law. . . . It follows, that, inasmuch as 15 years was the harshest sentence that could be imposed under the circumstances, 15 years stood as the maximum allowable by law."

321 Md. at 523, 583 A.2d at 713–714.

The *Dotson* Court also commented on the impact that a contrary conclusion would have on the institution of plea bargaining. The Court explained that not enforcing the defendant's expectations as represented in the plea bargain "would violate the sanctity of the plea agreement process and seriously undermine the principles on which that process is based." *Id.* at 524, 583 A.2d at 714. It opined that "[i]f a defendant could not rely upon the plea bargain, the chilling effect upon the very institution of plea bargaining would be devastating." *Id.* at 524, 583 A.2d at 714. Furthermore, the Court noted that allowing the plea agreement to be violated by other constituent members of the judiciary, "would be inconsistent with the standard of fair play and equity." *Id.* (quoting *Brockman*, 277 Md. at 697, 357 A.2d at 376.)

In *Chertkov v. State*, 335 Md. 161, 642 A.2d 232 (1994), this Court explained that the principles enunciated in *Dotson* were not limited to breaches of the plea agreement prejudicing a defendant. In that case, this Court considered whether a sentencing court may modify a sentence that it imposed pursuant to binding plea agreement, without the consent of both parties. *Chertkov v. State*, 335 Md. 161, 163, 642 A.2d 232, 233 (1994).[8] The *Chertkov* Court found that the trial

---

8. The issue of whether the trial court could legally modify, without consent of either party, a sentence imposed under a previously approved plea agreement was not central to the *Chertkov* Court's holding. *Chertkov v. State*, 335 Md. 161, 163, 642 A.2d 232, 233 (1994). Rather, the Court clarified that the State could only appeal a final judgment in a criminal case where that judgment failed to impose a sentence outside the minimum or maximum required by law. *Id.* at 166–167, 642 A.2d at 235. Because the crimes with which Chertkov was charged carried

court illegally modified the agreement in violation of the pre-existing plea agreement. The Court reasoned that the State and the defendant, as parties to the agreement, were within "reach of principles of fairness and equity." *Id.* at 174, 642 A.2d at 238 It explained:

"Just as a defendant would be loathe to participate in plea bargaining if he or she could not be certain that the bargain that he or she made would be fulfilled, so too would the State. There would be no incentive for the State to engage in plea bargaining if it were possible for a defendant to enter into a binding plea agreement only to have the sentence contemplated by that agreement modified a short time later. Nor would it be fair to the State, which is, after all, one of the parties to the agreement. *See* Rule 4–243(a)."

*Chertkov v. State,* 335 Md. 161, 174, 642 A.2d 232, 238–39 (1994). In explaining its disposition, this Court stated that *Chertkov* presented an even stronger case than *Dotson* for finding the binding plea agreement inviolate. In *Chertkov,* unlike *Dotson,* the same trial judge who approved the plea agreement calling for "a particular sentence" modified that sentence, thus prejudicing the State without its consent. From *Dotson* and *Chertkov,* it is clear that under Rule 4–243(c)(3) a court that binds itself to enforce the expectations of the parties in the accepted plea agreement relinquishes its discretionary rights beyond the accepted agreement to modify the sentence absent the consent of the parties, particularly the prejudiced party.

From the precedents set forth in *Chertkov* and *Dotson,* it is beyond dispute that the trial court in the case *sub judice,* by accepting the agreement, bound itself to enforce the parties' expectations as contained in that agreement.

---

no minimum sentence, the Court found that the trial court did not impose a sentence contrary to proscribed law by enforcing the sentence under the plea agreement, depriving the State of the right to appeal. *Id.* at 168, 642 A.2d at 235–236. The Court still addressed the modification issue, however, on the grounds that plea bargains constitute "a significant, if not critical" component to the administration of criminal justice. *Id.* at 170–171, 642 A.2d at 237.

The majority does not dispute the substance or the enforceability of the plea agreement. Instead, the majority, focusing on the fact that the ultimate disposition the agreement contemplated could not be immediately imposed, but would have to be preceded by another, more onerous disposition, parses the plea agreement into two component parts, related but temporally separate, to which it ascribes different characteristics and effects. 431 Md. at 129–31, 64 A.3d at 223–24. The plea agreement contemplated a conviction, a guilty finding and a sentence pursuant to that finding, being imposed. Notwithstanding that the agreement also contemplated that the conviction would be vacated, in the words of the trial judge, it "will transition to probation before judgment," by emphasizing that Delegate Alston, by entering into the plea agreement, waived her rights to appeal and the trial court, again consistent with the plea agreement, did not stay Delegate Alston's conviction, the majority attributes a finality to that conviction for purposes of disqualifying Delegate Alston from serving in the General Assembly. It finds solace in the Constitution's reference to "judicial review," which it equates with the appellate process, and the absence of any such review having been engaged or undertaken. 431 Md. at 129, 64 A.3d at 223. On the other hand, for purposes of the fulfillment of the plea agreement, it has to concede, it is not final, that the trial judge properly could and did strike the conviction and impose PBJ.

The fundamental flaw in the majority's approach is its focus on whether the conviction for misconduct in office, having been entered, could be appealed and, thus, was subject to appellate review. 431 Md. at 129–30, 64 A.3d at 223–24. Article XV, Section 2, permits the removal of a delegate from office only where her conviction becomes "final, after judicial review or otherwise." Article XV, Section 2 defines finality in terms of judicial review, not merely appellate review as discussed by the majority;[9] the Constitution recognizes it may be defined "otherwise."

---

9. As discussed above, the accepted plea agreement contemplated entry of Delegate Alston's conviction for misconduct in office, and required

" 'Final' means the final judgment of the highest court empowered to review the conviction." *Young v. Warden, Md. Penitentiary,* 245 Md. 76, 78, 224 A.2d 842, 843 (1966) (citing *Bell v. State,* 236 Md. 356, 363, 204 A.2d 54 (1964)). It is self-evident that a conviction cannot be both final and still subject to being stricken upon the completion of certain conditions contained in a binding plea agreement. While Delegate Alston waived her right to appeal to a higher court to challenge her verdict, she did not waive her right to have her conviction modified. Indeed, that was the very point of the agreement, to provide for a different, more favorable final disposition once certain conditions were met.

This very point belies the majority's two component part rationale and makes clear the true nature of a plea agreement. A plea agreement is a single contract, not a series of individual ones. Moreover, while it may be necessary for performance to occur in stages, its object and, therefore, benefit, is defined by its ultimate goal. Intermediate steps or benefits do not exist apart from that goal and have significance only in relation to it. That the agreement called for a conviction cannot be read in isolation; it also must be acknowledged that the parties intended that conviction to be replaced by another, more favorable, to the defendant, final disposition as soon as the defendant had done what it was agreed she would, and had to,

---

that the trial court strike the conviction once Delegate Alston performed community service hours, paid a restitution fine, and paid a civil fine. Delegate Alston, therefore, retained a potential challenge for the modification of her conviction; the trial court, by accepting the agreement, bound itself to modify Delegate Alston's conviction on subsequent review. The power of the trial court to strike its judgments is not in doubt. *See Chertkov v. State,* 335 Md. 161, 170, 642 A.2d 232, 236–237 (1994) ("It has long been well established that, in Maryland, trial courts have inherent power to modify their judgments both in civil and criminal cases") (citing *Madison v. State,* 205 Md. 425, 431, 109 A.2d 96, 99 (1954)); *See also* Md. Rule 4–345 (granting trial courts revisory power over sentences imposed under certain circumstances). Because Delegate Alston retained the ability to challenge her conviction, it is immaterial to the disposition of this case whether she waived her right to direct appeal. For this reason, although Delegate Alston's conviction was, and could, not be subject to appellate review, it was nevertheless subject to further judicial review in the trial court.

do. In short, the plea agreement itself created the basis for the challenge to the conviction that Delegate Alston makes, that it was not final. As the agreement clearly provides, the judge was bound by the agreement to, had no choice but to, strike Delegate Alston's conviction for misconduct in office upon the occurrence of certain conditions.

Rather than acknowledge that the trial court did not enter a final conviction because it bound itself to strike the conviction and sentence, the majority refuses to enforce Delegate Alston's expectations, as contained in the agreement and reiterated by the trial judge on the record. By doing so, the majority, introduces incongruence into our precedents, and effectively undermines the credibility of the plea bargaining regimen.

For the aforementioned reasons, I dissent.

Judges HARRELL and GREENE have authorized me to state that they join in this dissenting opinion.