916 A.2d 1015

**Melisande C. FRITSZCHE, et al.**

v.

**MARYLAND STATE BOARD OF ELECTIONS, et al.**

**No. 73, Sept. Term, 2006.**

Court of Appeals of Maryland.

Feb. 12, 2007.

**332**

Daniel Joseph (Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, Thomas C. Goldstein, Anthony T. Pierce, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, Deborah Liu, Washington, DC, David Rocan, Deborah Jeon, Baltimore, Jonah H. Goldman, Jon M. Greenbaum, Benjamin Blustein, Washington, DC, on brief), for appellants.

William F. Brockman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Cynthia G. Peltzman, Mark J. Davis, Asst. Attys. Gen., on brief), for appellees.

Argued before BELL, C.J., RAKER,*WILNER, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BELL, C.J.

This is an interlocutory appeal to this Court, see Maryland Code (2003, 2006 Cum.Supp.) § 12–203(a)(3) of the Election Law Article ("EL"),[1] from the decision of a Circuit Court in an election dispute. The petitioner, a Maryland resident and registered voter in Baltimore County, is currently a student at a college in New York. Because she is living out-of-state while attending college, she could not vote personally at her precinct

---

\* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Maryland Code (2003, 2006 Cum.Supp.) § 12–203 of the Election Law Article provides, as relevant:

" § 12–203. Procedure

"Generally

"(a) A proceeding under this subtitle shall be conducted in accordance with the Maryland Rules, except that:

"(1) the proceeding shall be heard and decided without a jury and as expeditiously as the circumstances require;

"(2) on the request of a party or sua sponte, the chief administrative judge of the circuit court may assign the case to a three-judge panel of circuit court judges; and

"(3) *an appeal shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court.*"

(Emphasis added).

polling station during the 2006 Maryland gubernatorial election. Rather, she intended to vote by absentee ballot. For that intent to be accomplished, her ballot had to be mailed to the County Board of Elections before Election Day. *See* Code of Maryland Regulations ("COMAR") 33.11.03.08(b).[2]

The petitioner alleges that in mid-August 2006, she requested of the County Board of Elections in Catonsville, Maryland, by both facsimile and mail, an absentee ballot for both the primary and the general election.[3] The absentee ballot for the general election, bearing the postmark of November 1, 2006, did not arrive in the mail until Monday, November 6, 2006. Although the petitioner received it before midnight, at about 8:45 p.m., when she returned home, the time for all routine mail pickups had passed and no post offices near her were open at that time. She did not mail the absentee ballot until the next day, November 7, 2006.

Because Election Day was on November 7, 2006, and the ballot was not "completed and mailed before election day," it was not be counted in the final tally. The petitioner, there-

---

2. COMAR 33.11.03.08(b) provides:

"B. In General. An absentee ballot is considered to have been timely received only if:

"(1) The ballot is received by the local board office before the polls close on election day; or

(2) The ballot:

"(a) Is received by the local board office from the United States Postal Service or a private mail carrier:

"(i) On or before 10 a.m. on the second Wednesday after a primary election preceding a gubernatorial election; or

"(ii) On or before 10 a.m. on the second Friday after a general or special election or in a primary election preceding a presidential election; and

"(b) Was mailed *before* election day, as verified:

"(i) By a postmark of the United States Postal Service, an Army Post Office, a Fleet Post Office, or the postal service of any other country; or

"(ii) By the voter's affidavit that the ballot was completed and mailed before election day, if the return envelope does not contain a postmark or the postmark is illegible."

(Emphasis added).

3. An absentee ballot for the primary election is not at issue here.

fore, contends that "[d]espite Appellants' [4] diligence in meeting their obligation to timely request absentee ballots, Appellants were not able to vote in this election by virtue of Code of Maryland Regulations ('COMAR') 33.11.03.08(b), which requires that absentee ballots be postmarked by November 6, 2006."

The petitioners filed, on November 6, 2006, a complaint in the Circuit Court for Anne Arundel County. The complaint contained four counts, asserting violations of the Maryland Constitution and Declaration of Rights. Count 1 alleged a violation of Article I, §§ 1 [5] and 3 [6] of the Maryland Constitu-

---

4. Initially, there were two plaintiffs. The second plaintiff was Mr. Malcolm G. Vinzant, Jr. The initial complaint described Mr. Vinzant as a resident of Baltimore, Maryland, where he is registered to vote. On October 31, 2006, he alleged, his wife traveled to the Baltimore City Board of Elections and applied for an absentee ballot, to be sent to Mr. Vinzant at his nursing home residence. The complaint further alleged that, as of November 6, 2006, the ballot had not yet arrived, rendering him unable to execute and postmark the ballot by November 6, 2006, as required by law. Due to his physical restrictions, and because his wife would not be able to assist him, he would, thus, be unable to access a polling station independently, and, therefore, to exercise his right to vote.

Mr. Vinzant's claim was rendered moot, however, after the Board contacted him personally as a courtesy, and he was able to vote successfully.

5. M.D. CON ST. art. I, § 1 provides:

" § 1. Elections by ballot; qualifications to vote
"All elections shall be by ballot. Every citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote in the ward or election district in which he resides at all elections to be held in this State. A person once entitled to vote in any election district, shall be entitled to vote there until he shall have acquired a residence in another election district or ward in this State."

6. M.D. CON ST. art. I, § 3 provides:

" § 3. Absentee voting
"The General Assembly of Maryland shall have power to provide by suitable enactment for voting by qualified voters of the State of Maryland who are absent at the time of any election in which they are entitled to vote and for voting by other qualified voters who are unable to vote personally and for the manner in which and the time

tion and Article 7 of the Declaration of Rights.[7]   Count 2 alleged a violation of the equal protection guarantee of Article 24 of the Declaration of Rights.[8]   Count 3 alleged a violation of the equal protection guaranteed by the Fourteenth Amendment to the federal Constitution.[9]   Count 4 purported to assert a violation of EL § 9–304,[10] made actionable by Article 19 of the Declaration of Rights.[11]

---

and place at which such absent voters may vote, and for the canvass and return of their votes."

**7.** Article 7 of the Declaration of Rights of the Maryland Constitution provides:
"Article 7.   Free and frequent elections;  right of suffrage
"That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government;  for this purpose, elections ought to be free and frequent;  and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

**8.** Article 24 of the Declaration of Rights of the Maryland Constitution provides:
"Article 24.   Due process
"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

**9.** U.S. CONST. amend.  XIV provides, as relevant:
"AMENDMENT XIV.  CITIZENSHIP;  PRIVILEGES AND IMMUNITIES;  DUE PROCESS;  EQUAL PROTECTION;  APPOINTMENT OF REPRESENTATION;  DISQUALIFICATION OF OFFICERS;  PUBLIC DEBT;  ENFORCEMENT "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;  nor shall any State deprive any person of life, liberty, or property, without due process of law;  nor deny to any person within its jurisdiction the equal protection of the laws."

**10.** Maryland Code (2003, 2006 Cum.Supp.) § 9–304 of the Election Law Article provides:
" § 9–304.   Qualification for absentee voting
"An individual may vote by absentee ballot except to the extent preempted under an applicable federal law."

**11.** Article 19 of the Declaration of Rights of the Maryland Constitution provides:

The petitioners asked for two forms of relief: that the respondent, the Maryland State Board of Elections ("the Board"),[12] accept all absentee ballots postmarked on Election Day, Tuesday, November 7, 2006, or, in the alternative, preserve all such ballots, "until such time as a full hearing on this matter may be conducted."[13]

In support of the former, the petitioner noted the Governor's urging of citizens to vote by absentee ballot, and that a deficiency in the number of ballots available prevented a number of voters who had requested the ballots from being able to return them in the time frame allotted by the Board. This, the petitioner argues, has the effect of disenfranchising voters, through no fault of their own; the Board did not get the ballots out in time, putting those voters in the position of not having their votes counted. Thus, the petitioner urges, "in order to give them that fundamental right to vote, ... we simply extend the time period for their votes to be counted so that they are postmarked at the end of [November 7] as opposed to [November 6]."

In response, the respondent points out that there is no constitutional right to an absentee ballot. They, in support of that proposition, cite *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 807–808, 89 S.Ct. 1404, 1408,

---

"Article 19.   Relief for injury to person or property

"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."

12.   While the Maryland State Board of Elections is the primary respondent in this case, Linda H. Lamone, State Administrator, Gilles W. Burger, Chairman, Bobbie S. Mack, Vice Chairman, Joan Beck, Boardmember, Andrew V. Jezik, Boardmember, and Susan Widerman, Boardmember, in their official capacities as Administrators and Board Members of the Maryland State Board of Elections were also named respondents.

13.   During the hearing, the petitioner withdrew her request for the second form of relief, after being informed that it was the practice of the Board to retain the documents she sought to have preserved for 22 months.

22 L.Ed.2d 739, 745 (1969), in which the Court held that absentee status, which was designed to make voting more available to some persons who cannot easily travel to polling places, does not, in itself, deny the right to exercise the franchise. Further, the respondent argues,

"the mere fact that the General Assembly of Maryland has made an absentee ballot process available does not mean that there is a constitutional right. Certainly not a constitutional right that is protected by a scrutiny analysis."

Thus, the respondent argues that the regulation that designated the date that absentee ballots should be mailed is a reasonable one, especially in light of the fact that voters could still turn their absentee ballots in in-person if they were able to. Citing the four factor test of *Department of Transportation v. Armacost*, 299 Md. 392, 474 A.2d 191 (1984), emphasizing the first factor, irreparable injury, the respondent observes that very little evidence of irreparable injury, if any, was provided by the complaint. They point out that no evidence was presented by the plaintiffs concerning the processing of absentee ballots, and neither of the two named plaintiffs testified, nor provided affidavits in support of the motion for a TRO. They also challenge the petitioners' standing, arguing that there was no evidence that "these two plaintiffs actually have the injury which their counsel alleges they have suffered." Moreover, the respondent is not convinced that the remedy sought-extending the voting deadline an additional day-would address the issue complained of or "whether the fact that the State Board and the local boards had some problems processing ballots is responsible for the injury that these particular Plaintiffs have suffered." The respondent asserts, as to the former, "[i]t is completely speculative that if the Court orders the deadline extended by an additional day that these two Plaintiffs will, in fact, receive their ballots and will be permitted to vote in the way they say."

In an oral opinion, the Circuit Court denied the plaintiffs' request for temporary restraining order and a preliminary injunction, noting:

"[I]t is hard for me to ignore what Judge Wilner wrote in *Lamb v. Hammond*. Especially the last part that says, 'It would be a greater evil for the Courts to ignore the law itself by permitting election officials to ignore statutory requirements designed to safeguard the integrity of elections, which is the rights of the voters.' "

"And candidly, after reading all the material and looking at the standards, regretfully, I am not convinced that a TRO or a temporary injunction should be granted in this matter. I don't think the burden has been met. So, I am going to deny the motion. . . . "

Prior to the Circuit Court's issuance of its written order and mandate, the petitioner, on November 8, 2006, pursuant to EL § 12–203(a)(3), filed a direct interlocutory appeal to this Court, and petitioned this Court for a writ of certiorari, which we granted. *Fritszche v. State*, 395 Md. 485, 910 A.2d 1100 (2006).

Oral argument was held on November 13, 2006, and an order affirming the Circuit Court's judgment followed. This opinion explains the reasons for that order.

### A.

Maryland Rule 15–501(b) defines a "preliminary injunction" as "an injunction granted after opportunity for a full adversary hearing on the propriety of its issuance but before a final determination of the merits of the action." The granting of temporary restraining orders and preliminary injunctions is controlled by Maryland Rule 15–504, which provides, as relevant:

"(a) Standard for Granting. A temporary restraining order may be granted only if it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary hearing can be held on the propriety of a preliminary or final injunction."

Moreover, this Court has enumerated four factors which must be considered by trial courts in deciding whether a TRO should issue:

"(1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest."

*In re Application of Kimmer*, 392 Md. 251, 260, 896 A.2d 1006, 1012 (2006). *See also LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 300–301, 849 A.2d 451, 458–59 (2004); *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 654 A.2d 449 (1995); *Lerner v. Lerner*, 306 Md. 771, 776, 511 A.2d 501, 504 (1986); *State Dep't of Health and Mental Hygiene v. Baltimore County*, 281 Md. 548, 554, 383 A.2d 51, 55 (1977).

The gravamen of the petitioner's claim is that the Board, in failing to answer the overwhelming call for absentee ballots, has violated both State and Federal law by "denying eligible voters the opportunity to vote or, at least, by imposing a severe burden on the right to vote." She notes that following the General Assembly's enactment of legislation, which gave every Maryland voter the right to cast an absentee ballot as long as a timely request was made to the local board of elections, Governor Ehrlich urged the voters to take advantage of this option " 'to avoid long lines and malfunctioning technology at polling places,' " that as of Thursday, November 2, 2006, approximately 186,000 registered voters requested to vote by absentee ballot—"almost triple the number of absentee ballots submitted during the most recent mid-term election in 2002,"—and asserts that "[a]s a result of this onslaught of absentee ballot requests, local boards of election have been unable to timely fulfill absentee ballot orders, creating a statewide emergency." The result, the petitioner claims, is that many voters did not receive ballots in time to have them postmarked on November 6, 2006. She notes further:

"According to the Maryland General Assembly's Office of Legislative Audits, problems with the printing and delivery

of absentee ballots to local boards were identified nearly three weeks ago, during the week of October 16, 2006.[ ] Despite the early identification of these problems, many counties simply were not supplied with absentee ballots by the Appellees' vendor with any time left for them to timely fulfill the voters' absentee ballot requests."

The petitioner argues that COMAR 33.11.03.08(b), which establishes the November 6, 2006 deadline, "represents the discretionary exercise of the Appellees' regulatory powers," and that no statute requires this deadline.

■■■■ In order to succeed on the merits, the petitioner must show that the election regulation establishing the deadline for the postmark of absentee ballots, as executed and applied, is "arbitrary, capricious or unreasonable." *Baltimore Import Car Service & Storage, Inc. v. Maryland Port Authority*, 258 Md. 335, 342, 265 A.2d 866, 869 (1970). When an administrative agency, such as the Board, is vested with discretion, and exercises it within the scope of its authority, the courts will not intervene and substitute their judgment for that of the administrative body. *Baltimore Import Car Service & Storage, Inc.*, 258 Md. at 342, 265 A.2d at 869; *Stacy v. Montgomery County*, 239 Md. 189, 194, 210 A.2d 540, 543 (1965); *Kaufman v. Taxicab Bureau*, 236 Md. 476, 204 A.2d 521, 523 (1964), *cert. denied*, 382 U.S. 849, 86 S.Ct. 95, 15 L.Ed.2d 88 (1965); *Serio v. Mayor & C.C. of Baltimore*, 208 Md. 545, 551, 119 A.2d 387, 390 (1956); *Masson v. Reindollar*, 193 Md. 683, 688–689, 69 A.2d 482 (1949); *Gianforte v. Bd. of License Com'rs*, 190 Md. 492, 58 A.2d 902 (1948). Courts will act, however, where an administrative decision is not supported by facts, or where an action is not within the scope of delegated authority, or is arbitrary, capricious or unreasonable. *Baltimore Import Car Service & Storage, Inc.*, 258 Md. at 342, 265 A.2d at 869; *Board of Education of Carroll County v. Allender*, 206 Md. 466, 475, 112 A.2d 455, 459 (1955); *Heaps v. Cobb*, 185 Md. 372, 380, 45 A.2d 73, 76 (1945); *Hecht v. Crook*, 184 Md. 271, 280–281, 40 A.2d 673, 677 (1945).

The petitioner offers a number of examples that point to the fact that the regulation, as applied, resulted in an unreasonable denial of the absentee voters' right to vote. First, the petitioner notes that the Board of Elections of Prince George's County completed its absentee ballot mailing on Saturday, November 4, 2006, "allowing at most one business day for absentee ballots to be delivered to voters' mailboxes and for voters to complete, sign, and postmark the absentee ballots by November 6," and "[f]or voters who did not receive their ballots until the afternoon of November 6, this time period may have been just a matter of hours, if there was any time at all." The petitioner notes that voters with Maryland residences who requested their ballots be mailed out-of-state may not have received their ballots at all.

Second, the petitioner states that, as of Monday, November 6, 2006, the Maryland State Board of Elections reported that at least 900 absentee ballots were not sent out until Saturday, November 4, 2006, and approximately 2,350 ballots were not sent out until Friday, November 3. Thus, she concludes, "[a]s a result of these delays, many voters have not received or were not able to send out their absentee ballots by the postmark date."

The Board, in response, concludes "[i]t is impossible to determine whether this processing close to the November 6 postmark deadline was due to a large backlog of requests, the timing of the requests; or a combination of those factors...." [14] It points out that "[m]any Maryland voters apparently waited until the midnight of the October 31 deadline to request an absentee ballot." COMAR 33.11.02.02D.[15] Further-

_____

14. The Board also maintains that despite the unprecedented number of requests for absentee ballots by Maryland voters, the return rate was well within national norms.

15. COMAR 33.11.02.02D provides:

"D. Deadline for Receipt of Application. An application under this regulation must be received by the local board as follows:

more, it notes that a large number of requests were processed on the days preceding the November 6 postmark deadline, and that a large number of absentee ballots that were mailed in were processed on the days preceding the election. The Board urges upholding the Circuit Court decision, on the basis that:

> "a number of pertinent factors are simply unknown, including: how many ballots will be returned that are postmarked November 7; how many of that number were sent by people who made late requests for the ballots; how many of the November 7 postmarked ballots were sent by people who received ballots in time to return them by the November 6 deadline but waited to put them in the mail; how many late-arriving ballots were due to tardy mail delivery, as opposed to late mailing by the local board; or and any number of other pertinent facts. Some of these facts can be ascertained in the coming days, some can never be ascertained, and none of them was known to the circuit court . . . when it denied the plaintiff's request for TRO."

This Court agrees with the Board. The record is scant and not well developed; as a result, there was very little for the trial court to use in order to grant a TRO, and, transitively, very little for this Court to use to overturn its decision. No evidence was presented showing that, other than the petitioner, particular ballots arrived at particular voters' residences too late to permit those voters to vote. Nothing has been presented that establishes a link between the Board's processing of the absentee ballots and the delay in absentee ballot returns. While, to be sure, a number of ballots were mailed very close to Election Day, it is unknown which of the ballots that were postmarked after November 6 were from voters who received them earlier but merely were tardy in returning them and which were ballots that were received late and,

---

"(1) On or before 11:59:59 p.m. of the Tuesday preceding the election for an application submitted by electronic facsimile transmission; and

"(2) On or before 4:30 p.m. of the Tuesday preceding the election for all other applications."

therefore, could not have been returned earlier. This lack of evidence results in the petitioner's failure to establish that the COMAR regulation, as applied, was the primary cause of the petitioner's injury, i.e. that it was, as applied, "arbitrary, capricious or unreasonable." As articulated by the respondent, "[the petitioner's argument] would require courts to entertain petitions from prospective voters attesting that they would have mailed the ballot but for their reliance on the law."

This Court will not second guess the decision made by the State Board of Elections to refuse to include any absentee ballots that failed the requirements of COMAR 33.11.03.08(b).

### B.

The petitioner also argues that "*Lamb* strongly suggests that the state must accommodate Appellants and similarly situated voters by accepting ballots postmarked on November 7, 2006," because "*Lamb*'s basic holding was that state election statutes should be strictly applied notwithstanding the negligence of state officials."

*Lamb v. Hammond* involved a close race between two candidates for a seat in the House of Delegates. Trailing Lamb by three votes, Hammond challenged the decision of the Board of Elections not to count 24 absentee ballots, 12 of which were rejected unopened, due to a deficiency based on the ballots' postmarks, and 12 of which were rejected for other deficiencies. 308 Md. at 290, 518 A.2d at 1059. The trial court opened the 12 unopened ballots and, noting that each voter had signed an affidavit that the ballot had been completed and mailed no later than the day before the election, 308 Md. at 290, 518 A.2d at 1059, ordered the board to accept those votes. That resulted in Hammond being declared the winner by one vote. 308 Md. at 289, 518 A.2d at 1058. Lamb appealed.[16]

---

16. Lamb argued that the trial court's decision was improper for lack of jurisdiction, that the House of Delegates was the only proper body to resolve the controversy.

The merits of the issue before the Court involved whether the disputed absentee ballots should have been counted pursuant to Md.Code (1957, 1983 Repl.Vol., 1985 Cum.Supp.) Art. 33, § 27–9(c)(1). That statute designated an absentee ballot as timely if:

"(i) It has been received by the board prior to the closing of the polls on election day; or

"(ii)

"1. It was mailed before election day;

---

Note 16—Continued

This Court rejected the jurisdictional argument. First, it noted that, under Md.Code Ann. Art. 33, § 27–10, "contests 'concerning ... the validity of any ballot under this subtitle shall be decided by the board [of canvassers] having jurisdiction of the matter' and that '[a]ny candidate or absentee voter aggrieved by any decision or action of such board shall have the right of appeal to the circuit court for the county to review such decision or action, and jurisdiction to hear and determine such appeals is hereby conferred *upon said courts.*'" 308 Md. at 291, 518 A.2d at 1059. Accordingly, this Court noted, "circuit courts have long been vested with a limited jurisdiction to review the actions of administrative officials, including election officials, to determine whether those officials have exceeded the authority delegated to them, and, if so, to direct that they act in conformance with the law." 308 Md. at 292, 518 A.2d at 1060 (1987). This authority was also granted by the legislative branch, which, after creating the board of canvassers, "authorized the courts to perform their ancient and traditional role of seeing to it, upon complaint, that these administrative officials follow those directions and remain within the bounds of their circumscribed authority." 308 Md. at 303, 518 A.2d at 1065.

Separation of powers was not at issue, we explained, as the Court was not overturning a legislative decision, or enjoining the House of Delegates from deciding a contest properly before it; rather, the Court's role is to ensure that those officials do not "act arbitrarily or capriciously, ... disenfranchise people who are legally entitled to vote and who have cast their ballots in full compliance with the law, or, conversely, ... credit votes that are patently unlawful." 308 Md. at 304, 518 A.2d at 1066. The duties of election officials "can be 'judicially identified,' its breach can be 'judicially determined,' and a protective remedy can be 'judicially molded.'" 308 Md. at 304, 518 A.2d at 1066. Accordingly,

"upon a timely complaint that canvassing officials have improperly refused to canvass votes that were lawfully cast, the appropriate court has, and may exercise, its traditional jurisdiction. It may inquire into the matter, determine whether the administrative officials have carried out their ministerial duties in accordance with the law, and, if they have not, command them to do so. That is all that the Circuit Court was asked to do in this case."

"2. The United State[s] Postal Service, or the postal service of any other country, has provided verification of that fact by affixing a mark so indicating on the covering envelope; and

"3. The board receives the ballot from the United States Postal Service not later than 4 p.m. on the Wednesday following election day."

(Emphasis added.)

Pursuant to this statute, the Court analyzed the votes and concluded that, despite the affidavits, the ballots were post-marked too late, and, thus, were untimely. 308 Md. at 308–309, 518 A.2d at 1068. Hammond, the winner as a result of the included votes, fought on two separate grounds against this technical noncompliance: "(1) that the requirement of 'verification' by postmark is merely 'directory,' that the only 'mandatory' requirement is that the ballot be received by the alternate deadline, and that, as the 'mandatory' requirement has been satisfied, there has been substantial compliance with the law, and (2) that a voter should not be disenfranchised for technical noncompliance with the statutory requirement where he or she follows the instructions of the election officials." 308 Md. at 309, 518 A.2d at 1068.

This Court dismissed the notion that clear commands from the Legislature may be disregarded as "merely directory," explaining:

"The Legislature has accorded absentee voters a special privilege not shared by other voters—the privilege of having their vote count even though received by the election offi-cials after the polls have closed. Unqualified, or qualified only by a deadline on *receipt* of the ballot, that privilege could become a distinctly unfair political advantage; it would allow a group of voters actually to cast their ballots after the polls had closed, and thus open the way for some very unwholesome machinations. The Legislature was very careful to avoid that possibility by requiring not only that

Note 16—Continued
308   Md. at 304, 518 A.2d at 1066.

the ballot actually be mailed before election day but also that there be an official verification of that fact by means of a postmark. Given the care that the Legislature has traditionally shown in crafting the State election laws, we cannot conceive that it intended those requirements to be other than mandatory."

308 Md. at 309–310, 518 A.2d at 1068–1069.

We recognized that while "unimportant mistakes made by election officials should not be allowed to thwart the will of the people freely expressed at the ballot box" or that "mere irregularities ... should not be allowed to set aside what the voters have decided," 308 Md. at 310–311, 518 A.2d at 1069, the Court had always strived to sustain votes that were in substantial compliance with the requirements of law, 308 Md. at 311, 518 A.2d at 1069, and has "never sanctioned the counting of ballots that were plainly in violation of a law particularly designed to protect the integrity of the elective process." *Id.* We concluded:

"It is unfortunate that voters should lose their votes by oversight of election officials-and by their own failure to notice that they have not been given authenticated ballots. But, as has often been said, *it would be a greater evil for the courts to ignore the law itself by permitting election officials to ignore statutory requirements designed to safeguard the integrity of elections, i.e., the rights of all the voters."*

308 Md. at 310–311, 518 A.2d at 1069.

Thus, while the petitioner interprets *Lamb* to stand for the proposition that, "state election statutes should be strictly applied notwithstanding the negligence of state officials," *Lamb*, contrary to the petitioner's belief, does not dictate that the State must accommodate the petitioner. Instead, *Lamb* compels this Court, in the absence of any clear evidence of the opposite conclusion, to exclude of the noncompliant votes in order to safeguard the election process.