Kathy Fuller, et al. v. Republican Central Committee of Carroll County, Maryland, No. 92, September Term, 2014

**CONSTITUTIONAL INTERPRETATION — MARYLAND CONSTITUTION — ARTICLE III, SECTION 13(a)(1) — APPOINTMENT TO FILL A VACANCY IN AN ELECTED OFFICE —** Article III, § 13 of the Maryland Constitution provides that, if there is a vacancy in the General Assembly, "the Governor shall appoint a person to fill such vacancy from a person whose name shall be submitted to him in writing" by the party central committee. This constitutional provision imposes a duty on the Governor only, not on a party central committee. Therefore, the provision's use of the phrase "from a person whose name shall be submitted" does not require a party central committee to submit only one name to the Governor to fill a vacancy in the General Assembly. Instead, a party central committee may submit to the Governor multiple names to fill a vacancy, and the Governor must appoint a person from among those whose names were submitted.

IN THE COURT OF APPEALS
OF MARYLAND

No. 92

September Term, 2014

KATHY FULLER, ET AL.

v.

REPUBLICAN CENTRAL COMMITTEE OF
CARROLL COUNTY, MARYLAND

Barbera, C.J.,
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Barbera, C.J.

Filed: August 21, 2015

*Harrell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

We granted certiorari in this case to consider the respective roles of the Governor and a party central committee in filling a vacancy created by the departure of a sitting member of the General Assembly. Those roles are spelled out in Section 13(a)(1) of Article III of the Maryland Constitution ("Section 13"). This subsection provides in pertinent part that, in the case of a vacancy,

> the Governor shall appoint a person to fill such vacancy from a person whose name shall be submitted to him in writing, within thirty days after the occurrence of the vacancy, by the Central Committee of the political party, if any, with which the Delegate or Senator, so vacating, had been affiliated, . . . and it shall be the duty of the Governor to make said appointment within fifteen days after the submission thereof to him.

Md. Const. art. III, § 13(a)(1). The dispute in the present case centers on the proper construction of the text of this subsection.

Petitioners Kathy Fuller ("Fuller"), Melissa Caudell ("Caudell"), and Amy Gilford ("Gilford") are registered Republican voters and duly elected members of the Respondent, Republican Central Committee of Carroll County, Maryland ("Central Committee" or "Committee"). Petitioners filed in the Circuit Court for Carroll County a complaint for mandamus, declaratory judgment, and injunctive relief against the Central Committee, seeking to enjoin the Committee from submitting more than one name to Governor Lawrence J. Hogan, Jr. to fill a vacancy in the House of Delegates. Petitioners later filed an amended complaint along with a motion for a temporary restraining order, which the court denied after a hearing. From that order and the order denying them injunctive relief, Petitioners noted an appeal, then sought certiorari.

We granted the writ and, upon motion of Petitioners, we issued a temporary restraining order pending final disposition of the appeal. On March 2, 2015, we heard arguments in the case. That same day, we entered a per curiam order affirming the judgment of the circuit court and lifting the temporary restraining order. We here explain the reasons for that order.

I.

Maryland law provides that "[e]ach political party shall have a State central committee that: (1) is the governing body of the political party; and (2) may be composed of the members of the central committees of the counties during their terms in office." Md. Code Ann., Elec. Law § 4-201 (2002, 2010 Repl. Vol.); *see also Suessmann v. Lamone*, 383 Md. 697, 725 n.14 (2004). Members of the county central committees are elected by the party at a primary election. Elec. Law § 4-202(a).

Central committees are not public bodies, and the members of those committees are not public officers, but rather, party officers. *Capron v. Mandel*, 250 Md. 255, 260 (1968); *Dorf v. Skolnik*, 280 Md. 101, 113 (1977) (stating that, "although membership on a political committee is governed by statute, it is not a public office"). Under the First and Fourteenth Amendments, political parties have the right of free association, giving them the right to determine their own rules and internal operating procedures. *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989) ("Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders."); *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 121 (1981) (holding that the state cannot dictate the process of selecting delegates to the

2

Democratic National Convention). In Maryland, a political party's State central committee "shall determine its own rules of procedure," so long as those rules do not conflict with the Election Law Article of the Code. Elec. Law § 4-201(c). The Election Law Article further provides that "each political party shall adopt and be governed by a constitution and all bylaws and rules adopted in accordance with the constitution," *id.* § 4-204(a), and a county central committee, "[i]n accordance with the constitution and bylaws of a principal political party . . . shall adopt a constitution, bylaws, and rules," *id.* § 4-204(c).

The origin of the present legal dispute can be traced back to December 10, 2014, when the Chairman of the Central Committee received notification that Joseph M. Getty, the incumbent Senator for District 5,[1] would be resigning from the Senate in order to accept a position in the administration of Governor-Elect Hogan. Pursuant to Section 13, the Governor has the duty to appoint a successor "from a person whose name shall be submitted to him in writing . . . by the Central Committee of the political party" of the vacating legislator. In anticipation of Senator Getty's upcoming resignation, the Central Committee undertook to perform its role in the selection process.

In December 2014, the Central Committee published a document entitled "Carroll County Republican Central Committee Process for Vacancy." The document provided that "[o]nly one candidate will be selected, upon receiving votes of the [Committee] and forwarded to the Governor for appointment." The Committee published instructions for applicants for the Senate vacancy, which likewise provided that only one candidate would

---

[1] District 5 is located entirely within Carroll County.

3

be selected. The Committee received applications from 14 interested persons and interviewed five of those applicants. On January 9, 2015, the Central Committee, by majority vote, selected Robin Bartlett Frazier ("Frazier") to submit to the Governor to fill the anticipated Senate vacancy. Soon thereafter, David Jones, Chairman of the Central Committee, signed a letter addressed to Governor Hogan post-dated January 22, 2015, evidently intending to submit Frazier's name to fill the anticipated vacancy.

On January 22, 2015, the Central Committee met in a public meeting. As of that date, Chairman Jones had not mailed the letter or otherwise formally submitted Frazier's name to the Governor. Following the public meeting, five members of the Committee (not including any of the three Petitioners or Central Committee member James Reter ("Reter")) met privately with members of Governor Hogan's staff. Petitioners allege, based upon their belief, that the Governor's staff asked the Central Committee members attending the private meeting to submit three names for potential appointment to the District 5 Senate vacancy. Petitioners further allege that the Committee members present during that meeting with the Governor's staff submitted to the Governor a list of three names for potential appointment to fill the vacancy: Frazier; Delegate Justin Ready, who represented District 5 in the House of Delegates; and Dave Wallace. The next day, Petitioner Fuller delivered to the Governor's appointments office the letter previously signed by Chairman Jones submitting only Frazier's name to Governor Hogan.

On February 2, 2015, Petitioners filed in the Circuit Court for Carroll County a complaint for declaratory judgment as well as injunctive and mandamus relief, naming as defendants the Central Committee, Delegate Ready, and Dave Wallace. Specifically,

4

Petitioners sought a declaration that Section 13 prohibited the Central Committee from submitting to the Governor more than one name for appointment to fill the vacancy; an injunction to preclude all defendants from pursuing the Committee's recommendation of three names; and issuance of a writ of mandamus compelling the Committee to comply with Section 13, as Petitioners alleged that constitutional provision must be construed.

Petitioners accompanied their complaint with a motion for a temporary restraining order and preliminary injunction. Later that day, the circuit court held a hearing on the motion for a temporary restraining order, at which counsel for Delegate Ready advised the court that Governor Hogan had issued a commission appointing Delegate Ready to the vacant Senate seat. The court denied the motion. That same evening, Delegate Ready resigned his seat as a delegate and immediately thereafter took the oath of office as Senator for District 5.

Senator Ready's resignation from the House of Delegates created a new vacancy to be filled. Pursuant to Section 13, the Central Committee had 30 days from February 2, 2015, to make a recommendation to the Governor. On February 4, 2015, the Governor's Secretary of Appointments, James Fielder, sent a letter to Chairman Jones asking him to "submit your recommended multiple candidates" for appointment. On February 9, 2015, the Central Committee announced that it was accepting applications to fill the vacancy.

The next day, Petitioners voluntarily dismissed Dave Wallace as a defendant. Petitioners also filed an amended complaint for mandamus, declaratory judgment, and injunctive relief, together with a second motion for a temporary restraining order and preliminary injunction, seeking to enjoin the Committee "from sending to the Governor of

5

Maryland the name of more than one person for appointment to the single vacancy" created by Senator Ready's resignation.

The circuit court held a hearing on the motion for a temporary restraining order, and denied the motion in a memorandum opinion and order. The court rejected Petitioners' argument that, under Maryland Rule 15-504(a),[2] they were not required to establish a likelihood of success on the merits in order to prevail on the motion. The circuit court, citing *Schisler v. State*, 394 Md. 519, 534 (2006), reasoned that a plaintiff seeking a temporary restraining order must satisfy the four-factor standard applicable whenever a plaintiff seeks interlocutory injunctive relief:

> (1) the likelihood that the plaintiff will succeed on the merits; (2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest.

Applying that standard, the court did not find "that immediate, substantial, and irreparable harm will result if the temporary restraining order is not granted," nor did it find "that there is a likelihood that [Petitioners] will succeed on the merits." As to the latter, the court rejected Petitioners' contention that Section 13 has a "clear and unambiguous" meaning entitling them to relief. The court reasoned that Section 13

---

[2] Maryland Rule 15-504(a) provides:
> A temporary restraining order may be granted only if it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary hearing can be held on the propriety of a preliminary or final injunction.

is susceptible of more than one interpretation, at least one of which is that a local central committee is not constrained to submit the name of only one person to the Governor to fill a vacancy in the legislature, and another of which is that the Governor has discretion to appoint a person from among multiple names submitted by the local central committee.

Petitioners voluntarily dismissed Senator Ready as a defendant in the action, noted an appeal to the Court of Special Appeals, and filed a motion in the circuit court for an injunction pending appeal. The circuit court denied the motion for an injunction pending appeal the following day.

Shortly thereafter, Petitioners sought, and on February 20, 2015, we issued, a writ of certiorari prior to proceedings in the Court of Special Appeals. Two questions are presented:

> Does Article 3, Section 13 of the Constitution of Maryland prohibit a party central committee from submitting more than one name to the Governor to fill a single vacancy in the General Assembly?

> Is a temporary restraining order followed by a writ of mandamus appropriate relief to prevent a party central committee from violating Article 3, Section 13 of the Constitution of Maryland, and were Petitioners entitled to a temporary restraining order?

Accompanying the petition was Petitioners' Motion for Injunction Pending Appeal, seeking to enjoin the Central Committee from submitting multiple names to the Governor to fill the existing vacancy pending this Court's resolution of the matter. We issued a temporary restraining order pending final disposition of the appeal.

## II.

The Central Committee argues that Petitioners "present[] a non-justiciable political question that is incapable of resolution through judicially-created or enforced standards."

7

According to the Committee, because it has a role in the process of filling a legislative vacancy, but no *duty* to submit a nominee to the Governor, this Court cannot fashion the requested relief of a writ of mandamus requiring the Committee to submit only one name to the Governor.

This Court has said that,

> [i]n deciding whether a claim is justiciable, the court must determine, first, "whether the claim presented and the relief sought are of the type which admit of judicial resolution," and, second, whether the structure of government "renders the issue presented a 'political question'—that is, a question which is not justiciable in federal [or State] court because of the separation of powers provided by the Constitution."

*Estate of Burris v. State*, 360 Md. 721, 744-45 (2000) (second alteration in original) (quoting *Powell v. McCormack*, 395 U.S. 486, 516-17 (1969)); *see also Smigiel v. Franchot*, 410 Md. 302, 324-25 (2009); *Lamb v. Hammond*, 308 Md. 286, 293 (1987).

The first element of the justiciability doctrine requires the court to decide "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Burris*, 360 Md. at 745 (internal quotation marks and citations omitted). The second element involves whether there is

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

8

*Baker v. Carr*, 369 U.S. 186, 217 (1962); *see also Powell*, 395 U.S. at 518-19; *Smigiel*, 410 Md. at 325; *Burris*, 360 Md. at 745 (quoting *Lamb*, 308 Md. at 293-94).

The Central Committee argues that Petitioners' complaint fails both elements of the justiciability doctrine. In connection with the first element, the Committee, relying upon what it argues is the proper interpretation of Section 13, characterizes as "identifiable but erroneous" Petitioners' claim that Section 13 prohibits the Central Committee from submitting more than one name to the Governor. The Central Committee adds that, even if Petitioners were correct in that interpretation of Section 13, this Court is unable, through a writ of mandamus, to "mold enforceable judicial relief that requires the Central Committee to submit one name to the Governor." In connection with the second element, the Central Committee, again resorting to the merits of its argument that its function in the Section 13 appointment process is discretionary, argues that Petitioners' question is a "political question," because the Committee, "[i]n performing that [discretionary] function . . . operates pursuant to its own internal procedures and processes for considering and selecting suitable candidates to fill vacancies."

We noted at the outset of this opinion that members of a party central committee are not public officers, but rather, party officers who can determine their committee's constitution, bylaws, and rules of procedure consistent with the party's State central committee. The question before us does not implicate any of those privileges and procedures. Moreover, although this Court generally does "not decide election contests or interfere in political controversies," the general rule of judicial non-interference in election-

9

related controversies is "not inflexible and lately has been considerably relaxed." *Valle v. Pressman*, 229 Md. 591, 594 (1962).

*Valle*, not unlike the present case, involved the question whether a central committee exceeded its authority under this State's statutory or constitutional requirements. *See id.* at 592. In *Valle*, we upheld the lower court's ruling that the complainants were entitled to litigate whether a local central committee, rather than a State central committee, was authorized to nominate an officer to a state-wide office. *Id.* at 594. We noted a distinction between "interferences by the courts with the political conduct of elections, and taking jurisdiction of a question whether persons assuming to avail themselves of the election machinery set up for private initiative are persons entitled under the law to do so." *Id.* at 595 (internal quotation marks omitted).

Similarly, in *Hammond v. Love*, 187 Md. 138, 144 (1946), a mandamus action, we decided that administrative or official decisions and actions concerning the elective process, if arbitrary or capricious, are subject to judicial review. And, in *Dorf*, 280 Md. at 110-11, we held that the courts have jurisdiction to resolve a challenge to the validity of the selection of a central committee on the ground that one of the committee's members was not a resident. More recently, in *Hall v. Prince George's County Democratic Central Committee*, 431 Md. 108, 130-31 (2013), although we had before us a challenge to the justiciability of the legal issues presented to us in that case, we did not hesitate to review the question whether a central committee had the legal authority to rescind its nomination to the Governor prior to the expiration of the 15-day constitutional requirement for the Governor to act on the nomination.

In the present case, the Central Committee concedes that this Court has jurisdiction to review situations "where affirmative acts by a party exceed the limits of its power." This is exactly what Petitioners allege here: that the Central Committee exceeded its authority under Section 13 by submitting three names to the Governor to fill a single vacancy. The Central Committee further argues that this Court does not possess the authority to issue a writ of mandamus in this case because the Central Committee "exercises discretion in performance of its function." For that proposition, the Central Committee relies upon the settled principle that "a writ of mandamus will not lie if the petitioner's right is unclear or issues only at the discretion of a decision maker[,] . . . 'or if there be any ordinary adequate legal remedy to which the party applying could have recourse, [the] writ will not be granted.'" *Wilson v. Simms*, 380 Md. 206, 223 (2004) (quoting *City of Seat Pleasant v. Jones*, 364 Md. 663, 673 (2001)). This argument likewise assumes the Committee's proposed answer to the question before us.

Each of the Central Committee's arguments for why the question is non-justiciable is grounded in the Committee's interpretation of the text and underlying purpose of Section 13, which, as noted, is precisely the question presented to us for decision: Whether that constitutional provision requires the Central Committee to submit only one name to the Governor or, instead, the Committee has the discretion to submit multiple names to fill a vacancy. Resolution of that question requires that we do no more than interpret Section 13 in order to identify the respective roles and obligations of the Governor and Central Committee.

11

In short, the question before us is one that self-evidently "admits of judicial resolution." *See, e.g.*, *State Bd. of Elections v. Snyder*, 435 Md. 30, 62 (2013) (construing Article I, § 1 of the Maryland Constitution to hold that voters turning 18 on the date of the general election could vote in the preceding non-partisan primary elections); *Nader for President v. Md. State Bd. of Elections*, 399 Md. 681, 708 (2007) (holding unconstitutional, pursuant to the Court's interpretation of Article I of the Maryland Constitution, a statutory provision requiring that each signature on a party's petition include a statement that the signer is a registered voter in a specific county). Moreover, we can answer the question without intrusion upon the authority and discretion of either the Central Committee or the Governor. Therefore, the question is justiciable.

### III.

At one time, Section 13 provided for a special election to fill a legislative vacancy created by "death, disqualification, resignation, refusal to act, expulsion, or removal." *See* Md. Const. art. III, § 13 (1924). In an effort to eliminate the costs of special elections, the Legislature amended Section 13 by enacting Chapter 584 of the 1935 Session of the General Assembly. That legislation, later ratified by the people of Maryland in the General Election of November 3, 1936, gave to the Governor the duty of appointing a person to fill a vacancy in the General Assembly, whether the vacancy occurs in the Senate or the House of Delegates.

Section 13(a)(1) provides, in pertinent part, that, in the case of a legislative vacancy,

the Governor shall appoint a person to fill such vacancy *from a person* whose name shall be submitted to him in writing, within thirty days after the occurrence of the vacancy, by the Central Committee of the political party,

12

if any, with which the Delegate or Senator, so vacating, had been affiliated . . . and it shall be the duty of the Governor to make said appointment within fifteen days after the submission thereof to him.

(emphasis added). Section 13(a)(2) provides:

If a name is not submitted by the Central Committee within thirty days after the occurrence of the vacancy, the Governor within another period of fifteen days shall appoint a person, who shall be affiliated with the same political party, if any as was that of the Delegate or Senator, whose office is to be filled, at the time of the last election or appointment of the vacating Delegate or Senator, and who is otherwise properly qualified to hold the office of Delegate or Senator in the District or County.

Md. Const. art. III, § 13(a)(2). Given the language of Section 13(a)(2), neither Petitioners nor the Central Committee dispute that, even if a party central committee does not make a recommendation to the Governor within the allotted time, the Governor retains the duty to carry out the obligation to fill the vacancy.

The question before us—whether Section 13 prohibits a party central committee from submitting more than one name to the Governor to fill a single vacancy in the General Assembly—turns on the meaning of subpart (a)(1) and specifically, the meaning of the phrase "the Governor shall appoint a person to fill such vacancy from a person whose name shall be submitted to him in writing." Petitioners assert that the use of the singular in the phrase "*a person* whose name shall be submitted to him in writing" denotes a requirement that no more than one name can be submitted to the Governor. They also argue that their interpretation is consistent with the legislative history of the 1936 amendment of Section 13 and this State's broader constitutional framework. Petitioners do not quarrel with the fact that it is the Governor, not the Central Committee, who has the constitutional duty of appointment.

13

The Central Committee counters that Section 13 imposes a duty *only* on the Governor and none on the Committee. Instead, the Central Committee possesses the discretion to submit more than one name to the Governor because it is authorized to create its own selection process pursuant to Elec. Law §§ 4-201(c) and 4-204(c).

"When interpreting constitutional provisions, we generally employ the same rules of construction that are applicable to the construction of statutory language." *Davis v. Slater*, 383 Md. 599, 604 (2004). We begin by looking to the plain language of the provision with a goal of "discern[ing] the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Id*. at 605.

We agree with the Central Committee that, read together, subsections (a)(1) and (2) of Section 13 *expressly* state only that the Governor has a constitutional duty in the appointment process and *expressly* acknowledge that a central committee is not required to submit the name of any person to the Governor for appointment. Common sense would seem to dictate, then, that the Central Committee has no duty to refrain from submitting more than one name.

We nonetheless grant to Petitioners their assertion that, read in isolation, the oddly-framed phrase "the Governor shall appoint a person to fill such vacancy from a person whose name shall be submitted to him in writing" is arguably "subject to 'two or more reasonable alternative interpretations.'" *Haile v. State*, 431 Md. 448, 467 (2013) (quoting *Price v. State*, 378 Md. 378, 387 (2003)). Without more than a "literal meaning" of the language within the provision, *W.R. Grace & Co. v. Swedo*, 439 Md. 441, 454 (2014), it is

14

unclear whether the second iteration of "a person" means "one person" or "any person."

In fact, the closest dictionary definition to the time of the amendment[3] notes that "a" is "not necessarily a singular term, it is often used in the sense of 'any.'" *See* BLACK'S LAW DICTIONARY (3d ed. 1933). Regardless of whether Section 13 is plain on its face or ambiguous, we are permitted to look to other sources to confirm what is plain or to resolve an ambiguity. *See Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 160 (2012) ("[E]ven when we believe that the language of the statute renders legislative intent clear, it is appropriate to examine the legislative history as a confirmatory process."); *Mayor & City Council of Balt. v. Chase*, 360 Md. 121, 131 (2000) ("[E]ven when the language of a statute is free from ambiguity, in the interest of completeness we may, and sometimes do, explore the legislative history of the statute under review.") (internal quotation marks omitted).

When the language of a statute or, as here, a constitutional provision, is unclear, we may refer to "external evidence . . . for discerning the purpose of the legislature, including the bill's title or function paragraphs, relevant case law, and secondary sources." *Davis*, 383 Md. at 605; *see also W.R. Grace*, 439 Md. at 453 ("If our review of the statute does

---

[3] This Court has frequently relied upon dictionary definitions prevalent at the time the relevant statutory language was adopted to discern its meaning. *See Harrison-Solomon v. State*, 442 Md. 254, 268 n.10 (2015) (quoting *Harvey v. Marshall*, 389 Md. 243, 260-61 n.11 (2005)) ("It is the sounder practice, when looking to the meaning of words used in a statute, for a court to 'resort to a dictionary, legal or otherwise, [which] should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments.'"); *Md. Overpak Corp. v. Mayor & City Council of Balt.*, 395 Md. 16, 49 n.20 (2006) ("We have pointed out that when courts find it prudent, in defining terms in the quest for understanding of statutory intent, to resort to dictionaries, it is advisable to make reference first to those dictionaries that were contemporaneous at the time the statutory language at issue was created.").

15

turn up ambiguous language, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.") (internal quotation marks omitted).

This Court has not interpreted previously the constitutional language at issue. Both parties, though, refer us to two Opinions of the Attorney General, 24 Md. Op. Att'y Gen. 367 (1939) and 62 Md. Op. Att'y Gen. 241 (1977). We are not bound by those opinions, but they can help elucidate the intention of the Legislature. *See Gomez*, 427 Md. at 170 n.36 (explaining that a court is not bound by an Attorney General's opinion but, "when the meaning of legislative language is not entirely clear, such legal interpretation should be given great consideration in determining the legislative intention[]") (quoting *State v. Crescent Cities Jaycees Found., Inc.*, 330 Md. 460, 470 (1993)). This is particularly so given that the General Assembly has not amended the pertinent language of Section 13 since issuance of either opinion of the Attorney General. *Gomez*, 427 Md. at 170 n.36 ("The Legislature is presumed to be aware of the Attorney General's statutory interpretation and, in the absence of enacting any change to the statutory language, to acquiesce in the Attorney General's construction.").

In 1939, the Chairman of the Democratic State Central Committee for Frederick County asked Attorney General William C. Walsh, in part: "Is it necessary for the State Central Committee to recommend more than one person for the vacancy [in the House of Delegates]?" The Attorney General opined:

> [W]e find in the Senate Journal for 1935, that when this amendment was introduced it provided, "The Governor shall appoint a person to fill such vacancy from two persons whose name shall be submitted . . .," and that it

16

was amended in the House by striking out, "two persons whose name," and inserting in lieu thereof "a person whose name." It, therefore, appears that the submission of only one name by the Committee was contemplated, and you are so advised.

24 Md. Op. Att'y Gen. at 367-68.

Petitioners argue that this legislative history of Section 13 supports their view that the Central Committee is required to submit no more than one name to the Governor to fill a vacancy. According to Petitioners, "[t]he provision for two names to be submitted to the Governor was stricken purposefully to limit the job-filling powers of the Governor[.]"

In 1977, Attorney General Francis B. Burch addressed a different question concerning the extent of a central committee's obligation(s) under Section 13. The Honorable Tyras Athey of the Maryland House of Delegates asked "whether it is permissible" for a State Central Committee "to submit more than one name for the Governor's consideration for the appointment." That question is close but not identical to the question before us.

Attorney General Burch began his response by reaffirming the above-quoted view of Attorney General Walsh in his 1939 opinion. 62 Md. Op. Att'y Gen. at 242. Attorney General Burch then opined:

> [I]t is our opinion that both the legislative history and the language of the provision itself indicate that the intent of Section 13 was that in the case of a vacancy in the General Assembly the appropriate State Central Committee submit the name of only one person to the Governor and that the Governor appoint that person to fill the vacancy.
>
> However, if a State Central Committee should ignore the clear intent of the Constitution and submit the names of two or more qualified persons to the Governor, the Governor cannot ignore the names submitted by the

17

> Committee. Rather, the Governor must appoint one of these persons to the vacancy.

*Id.* at 243-44 (footnote omitted).

Neither of these opinions supports Petitioners' view that Section 13 is to be read to mandate that the Central Committee submit no more than one name to the Governor. The 1939 opinion addresses the question whether a State Central Committee is *required* to recommend more than one name to the Governor, not whether the State Central Committee is *permitted* to do so. *See* 62 Md. Op. Att'y Gen. at 242 ("While it is possible to read our 1939 opinion as concluding that submission of more than one name is not permitted, we do not believe it should be so read since Attorney General Walsh [in the 1939 Opinion] was only responding to the question of whether submission of more than a single name was required (rather than permitted)."). At our invitation, Attorney General Frosh filed a Brief of Amicus Curiae in this matter, and joins in the views expressed by his predecessors.

We are persuaded by the formal opinions of Attorneys General Walsh and Burch, reaffirmed in the present case by Amicus Attorney General Frosh. Regardless of whether the Legislature intended for a State central committee to submit only one name should the committee elect to make a recommendation to the Governor, nothing in the text of that section or its legislative history imposes upon the central committee a duty to participate in the process, much less that its participation be limited to the submission of only one name. The sole duty set forth in Section 13 is upon the Governor to appoint a person from any name or names submitted in writing by the central committee.

This construction of Section 13 does not thwart its purpose. Attorney General Walsh noted in his 1939 Opinion that the two purposes of Section 13 were "to avoid the necessity of special elections to fill such vacancies and yet to provide that the appointee should be of the same political affiliation as the person whose office has become vacant." 24 Md. Op. Att'y Gen. at 368. Submission by the Central Committee of multiple names to the Governor does not undermine either of those dual purposes. We agree with Attorney General Frosh, as explained in his Brief of Amicus Curiae, that allowing the Central Committee to control the nominating process—whether it submits one name, multiple names, or no names—"addressed the legislature's 'same party affiliation' concern [and] served to advance the greater convenience, expedition and cost-saving implicit in the purpose of 'avoid[ing] the necessity of special elections.'" (quoting 24 Md. Op. Att'y Gen. at 368).

We are not persuaded, moreover, by Petitioners' additional argument that this interpretation would violate Maryland's constitutional structure—specifically that our holding runs afoul of Articles 7 and 8 of the Declaration of Rights.[4] Petitioners assert that,

_____

[4] Article 7 of the Maryland Declaration of Rights provides:
> That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage.

Article 8 provides:
> That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

19

"[w]hen a central committee submits more than one name to the Governor, it dilutes the right of the people who elected the committee's members to serve as their proxy to select their representative in the General Assembly in violation of Article 7." Petitioners further assert that, properly construed, Section 13 imposes upon the Governor a "ministerial" duty of appointment, and to construe Section 13 as the Central Committee argues would violate Article 8. Petitioners maintain that "[i]t would [be] an exercise by the Governor of a legislative function to have any role in making the choice of a state legislator[.]"

We disagree with both assertions. We have concluded that Section 13 grants to the Governor the constitutional duty of selecting a name to fill a vacancy from the name or names put forward by the party central committee, whether it be from one name or multiple names, or, if no name is put forward by the central committee, then to appoint a person of the Governor's choosing. Should this constitutional duty be at odds with the Declaration of Rights, the constitutional provision prevails. *See Broadwater v. State*, 306 Md. 597, 602 n.2 (1986) ("The constitutional section in question could not be invalid under the Declaration of Rights because if there were a conflict the specific provision in [the Constitution] would prevail.").

We hold that, insofar as Section 13 imposes a duty solely on the Governor, the constitutional provision does not require the Central Committee to submit only one name for nomination to the Governor. Instead, the Central Committee has the authority to determine its own procedures, which may include the submission of more than one name for consideration.

IV.

Petitioners have presented a second question that asks both whether the circuit court wrongly denied them a temporary restraining order and whether, ultimately, they would have been entitled to mandamus relief. Part of Petitioners' second question necessarily involves determining whether the court applied the correct standard in evaluating temporary restraining orders. Petitioners argue that the court did not apply the proper standard. They are of the view that courts should look only to Maryland Rule 15-504(a) for the correct standard; that is, Petitioners argue that they need only show the existence of "immediate, substantial, and irreparable harm" to receive a temporary restraining order. The Central Committee disagrees.

Our answer to Petitioners' first question, that Section 13 does not require the Central Committee to submit only one name for nomination to the Governor, renders Petitioners' second question moot. This Court rarely exercises its authority to resolve issues that have become moot. *See Alston v. State*, 433 Md. 275, 285 (2013). In this case, however, for purposes of clarity we address briefly the appropriate standard in evaluating a temporary restraining order.

In *Dep't of Transp. v. Armacost*, 299 Md. 392 (1984), this Court created a four-factor test for interlocutory injunctions. *Armacost* requires that courts consider the plaintiff's likelihood of success on the merits, the balance of harm to each party if relief is or is not granted, the potential for irreparable injury to the plaintiff, and the public interest. *Id.* at 404-05. Although *Armacost* did not involve a temporary restraining order, this Court has since applied the four-part test to decisions involving temporary restraining orders. *See Fritszche v. Md. State Bd. of Elections*, 397 Md. 331, 340 (2007) ("[T]his Court has

21

enumerated four factors which must be considered by trial courts in deciding whether a [temporary restraining order] should issue[.]”); *Schisler*, 394 Md. at 534 (applying the four factors when evaluating a temporary restraining order); *In re Kimmer*, 392 Md. 251, 260 n.13 (2006) (“In determining whether to issue a temporary restraining order, the trial court must examine and find four factors[.]”).

Petitioners correctly note that Maryland Rule 15-504(a) requires that a court find “immediate, substantial, and irreparable harm,” before granting a temporary restraining order. Contrary to Petitioners’ belief, this standard supplements the four-factor test for interlocutory injunctions established in *Armacost* rather than replaces it. Accordingly, a plaintiff requesting a temporary restraining order must show the existence of both “immediate, substantial, and irreparable harm” and the four factors required for the granting of interlocutory injunctions.

V.

In sum, the circuit court correctly determined that Petitioners were unlikely to succeed on the merits because the correct interpretation of Section 13 does not impose a duty on a party central committee to submit any fixed number of names to the Governor to fill a vacancy. Instead, a party central committee can submit no names, one name, or multiple names to the Governor, and Section 13 requires that, if the central committee makes a submission, then the Governor must appoint a person from the name or names that the party central committee provides. Based on this reasoning, we entered a per curiam order on March 2, 2015, affirming the circuit court’s February 12, 2015 decision denying Petitioners’ motion for a temporary restraining order.

22